# EXHIBIT 5a



# General Conditions
# of Carriage
## for passengers and baggage



Dear Passenger,

These General Conditions of Carriage are applicable to all flights, or portions of flights, for which the KLM Designator Code appears in the carrier box of your ticket or of the corresponding Coupon as well as those other situations specified in the General Conditions of Carriage.

This global version is last updated on 29 September 2022.


We wish you a pleasant flight.


Koninklijke Luchtvaart Maatschappij N.V.
P.O. Box 7700
1117 ZL Schiphol
The Netherlands

## CONTENTS

ARTICLE 1: DEFINITIONS ............................................................................................ 5

**ARTICLE 2: SCOPE OF APPLICATION** ................................................................... 9
2.1 General Provisions ........................................................................................... 9
2.2 Charters and Code Shares .............................................................................. 10
2.3 Contingency Plan for Lengthy Tarmac Delays (LTD) ....................................... 10
2.4 Predominance of the Law ................................................................................ 10

**ARTICLE 3: TICKETS** ............................................................................................. 10
3.1 General Provisions ........................................................................................... 10
3.2 Validity Period ................................................................................................. 11
3.3 Force Majeure invoked by a Passenger .......................................................... 12
3.4 Flight Coupon Sequential Order of Use ........................................................... 12
3.5 Changes Requested by a Passenger ............................................................... 13
3.6 Identification of the Carrier ............................................................................. 13

**ARTICLE 4: FARES, FEES, TAXES AND CHARGES** ................................................. 13
4.1 Fares ............................................................................................................... 13
4.2 Fees, Taxes and Charges ................................................................................. 13
4.3 Issue Fees charged by the Carrier ................................................................... 13
4.4 Payment Currency ........................................................................................... 14

**ARTICLE 5: RESERVATIONS** .................................................................................. 14
5.1 General Provisions ........................................................................................... 14
5.2 Reservation Requirements ............................................................................... 14
5.3 Seat Allocation ................................................................................................ 14
5.4 On Board Services ........................................................................................... 14
5.5 Aircraft type .................................................................................................... 14

**ARTICLE 6: PERSONAL DATA** ............................................................................... 15

**ARTICLE 7: SPECIAL ASSISTANCE** ....................................................................... 16

**ARTICLE 8: CHECK–IN/BOARDING** ...................................................................... 17

**ARTICLE 9: REFUSAL AND LIMITATION ON CARRIAGE** ........................................ 17

**ARTICLE 10: BAGGAGE** ........................................................................................ 19
10.1 General Provisions ......................................................................................... 19
10.1.1 The Passenger's Obligations ....................................................................... 19
10.1.2 Prohibited Items .......................................................................................... 19
10.1.3 Right of Search ............................................................................................ 20
10.1.4 Right to Refuse to Carry Baggage ............................................................... 20
10.2 Checked Baggage .......................................................................................... 20
10.2.1 General Provisions ....................................................................................... 20
10.2.2 Baggage Allowance ..................................................................................... 21
10.2.3 Special Declaration of Interest ..................................................................... 21
10.2.4 Collection and Delivery of Baggage ............................................................. 21
10.3 Unchecked Baggage ...................................................................................... 22
10.4 Animals ......................................................................................................... 22
10.4.1 General Provisions ....................................................................................... 22
10.4.2 Animals Travelling in the Cabin ................................................................... 23
10.4.3 Pets Travelling in the Hold .......................................................................... 23

**ARTICLE 11: SCHEDULES** ............................................................................................................... 23

**ARTICLE 12: DELAYS AND CANCELLATION OF FLIGHTS** ............................................................ 24

**ARTICLE 13: DENIED BOARDING AND DOWNGRADING** ............................................................ 24

**ARTICLE 14: REFUNDS** ................................................................................................................ 24

**ARTICLE 15: CONDUCT ABOARD THE AIRCRAFT** ..................................................................... 25

**ARTICLE 16: PROVISIONS FOR ANCILLARY SERVICES** .............................................................. 25

**ARTICLE 17: SUCCESSIVE AIR CARRIERS** .................................................................................. 26

**ARTICLE 18: ADMINISTRATIVE FORMALITIES** .......................................................................... 26

18.1 General Provisions ................................................................................................................ 26

18.2 Travel Documents ................................................................................................................. 26

18.3 Refusal of Entry .................................................................................................................... 27

18.4 Passenger Liability for Fines, Detention Costs, etc ............................................................. 27

18.5 Customs Inspections............................................................................................................. 27

18.6 Security Checks .................................................................................................................... 27

**ARTICLE 19: LIABILITY FOR DAMAGE** ....................................................................................... 27

19.1 General Provisions ................................................................................................................ 27

19.2 Provisions Applicable to International and Interior Flights ................................................... 28

19.2.1 Bodily Injury ...................................................................................................................... 28

19.2.2 Damage as a result of Delays ........................................................................................... 29

19.2.3 Damage to Baggage........................................................................................................... 29

**ARTICLE 20: TIME LIMIT ON CLAIMS AND LIABILITY ACTION**.................................................. 30

20.1 Notification of Claims for Baggage ....................................................................................... 30

20.2 Liability Actions by Passengers ............................................................................................ 30

20.3 Claims and Actions to be Submitted in Writing ................................................................... 30

## ARTICLE 1: DEFINITIONS

Within these conditions and except as otherwise provided for herein, the following terms are used with the meaning given below:

**Actual Carrier (or Operating Carrier)** means the carrier who actually operates the flight.

**Administration Fees** means fees charged, where applicable, to the Passenger by the Carrier and/or its Authorised Agent, such as but not limited to in consideration for the modification ("Modification Fees"), reissue ("Reissue Fees") or refund ("Refund Fees") of a Ticket. The Passenger shall be informed by the Carrier of the amount of applicable Administration Fees prior to finalisation of their Reservation.

**Agreed Stopping Place** means a scheduled stop by the Carrier which is located between the Place of Departure and the Place of Destination as shown in the Schedules.

**Air Carriage (or Air Travel)** means the carriage of a Passenger and their Baggage on an aircraft.

**Article** means an article of these General Conditions of Carriage.

**Authorised Agent** means an individual or legal entity that is authorised by the Carrier to represent the Carrier in the sale of Air Carriage tickets for its services or for the services of another Carrier if said agent is so authorised.

**Baggage** means both Checked Baggage and Unchecked Baggage, unless otherwise specified.

**Baggage Allowance** means the maximum quantity of Baggage (in terms of number and/or weight and/or dimensions), if any, determined by the Carrier and with which each Passenger may travel whether or not in return for a payment depending on the fare conditions.

**Baggage Check** means the portion of the Identification Form issued to the Passenger by the Carrier relating to the carriage of Checked Baggage.

**Baggage Tag** means the portion of Identification Form that is affixed to the Checked Baggage.

**Beneficiary** means the Passenger or any person who can claim compensation for or on behalf of said Passenger, in accordance with the applicable law.

**Cabin Baggage** (see Unchecked Baggage)

**Carrier** means KLM and/or any other carrier for which the Designator Code appears on the Ticket, or a Conjunction Ticket.

**Chartering** means the operation whereby the Carrier having concluded a Contract of Carriage with the Passenger ("Contractual Carrier") subcontracted to another carrier ("Actual Carrier") responsibility for performing all or part of the Air Carriage. This also means the operation whereby any other party that has contracted with the Passenger (for example a tour operator) entrusts the Carrier with performing all or part of the Air Carriage in connection with package travel, package holidays and package tours, including under EC directive 90/314. The "Contractual Carrier" in this

respect is the charterer or tour operator who as a principal enters into an agreement for carriage with the Passenger or another person.

**Charter Ticket** means a ticket, in electronic form or otherwise, issued pursuant to a Charter Contract.

**Checked Baggage** means Baggage of which the Carrier has taken custody and for which an Identification Form has been issued.

**Check-In Deadlines (CID)** means the time limit before which Passengers must have carried out their check-in formalities and received their boarding card, and where applicable the Baggage must have been issued at the check in desk in accordance with Article 10.2.

**Code Share** (see Code Share Flight)

**Code Share Flight** means a flight operated by an Air Carrier that can be either the Carrier with which the Passenger concluded a Contract of Carriage (Contracting Carrier or Contractual Carrier) or another carrier operating the flight (the Actual Carrier) with which the Contracting Carrier has associated its Designator Code.

**Conjunction Ticket** means a Ticket the issue of which is rendered necessary because of the large number of Coupons for a primary Ticket.

**Contingency Plan for lengthy tarmac delays** means the contingency plan adopted by the Carrier in the event of a significant delay of the aircraft on the tarmac at an airport located within the U.S. territory, as described by the U.S. Department of Transportation (DOT).

**Contract of Carriage** means the declarations and provisions appearing on the Ticket, identified as such and incorporating these General Conditions of Carriage as well as notices to Passengers.

**Contracting Carrier or Contractual Carrier** means the Carrier with which the Passenger has concluded a Contract of Carriage and for which the Designator Code appears on the Ticket.

**Convention** means, as applicable:
(a) the Convention for the Unification of Certain Rules in Warsaw on 12 October 1929;
(b) the Hague Protocol of 28 September 1955, which amended the Warsaw Convention;
(c) the Guadalajara Supplementary Convention of 18 September 1961.
(d) Montreal Protocols 1, 2 and 4 (1975), which amended the Warsaw Convention;
(e) a combination of the aforementioned Conventions and Protocols;
(f) the Convention for the Unification of Certain Rules for International Carriage by Air, signed in Montreal on 28 May 1999.

**Coupon** means a paper Flight Coupon or an Electronic Coupon, each of which bears the name of the Passenger who is to take the flight identified on the Coupon.

**Damage** includes death, injury to a Passenger, delay, loss, partial loss, or other of whatsoever nature arising out of or in connection with Air Carriage or other services performed by the Carrier incidental thereto.

**Days** mean the calendar days that include the seven days of the week, it being understood that in the event of notice being issued, the dispatch day is not included and that, in order to determine the validity of a Ticket, the date of Ticket issue or the flight departure date are not counted.

**Denied Boarding** means the refusal to carry a Passenger on a flight, although the Passenger presented himself prior to boarding according to article 3, paragraph 2 of EU Regulation 261/2004, except where there are reasonable grounds for the denial such as reasons of health, safety, security or inadequate travel documentation.

**Designator Code** means the code issued by IATA, which identifies each carrier using two or more alphabetical, numerical or alphanumeric characters and that is shown amongst others on the Ticket.

**Electronic Coupon** means an electronic Flight Coupon or any other document that has the same value, which is stored in digital format in the Carrier's computerised reservation system.

**Electronic Ticket** means the Ticket saved by the Carrier or at its request by a computerised Reservation system and that is evidenced by the Travel Memo (also called the Itinerary and Receipt), the electronic Flight Coupon or any other document that has the same value, issued by the Carrier on its name.

**Fares** means the fares, charges, levies, costs for a journey charged to the Passenger, for a specified reservation class, for given routes, and, where applicable, flights and dates, and the corresponding fare conditions.

**Fare Excluding Tax** means the Fare charged to the Passenger, excluding Taxes and Issue Fees.

**Fare Including Tax** means the Net Fare plus Tax.

**Flight Coupon** means the portion of the Ticket identified as being "valid for carriage" or, for Electronic Tickets, the Electronic Coupon that shows the exact points between which the Passenger must be carried.

**Force Majeure** means extraordinary and unforeseeable circumstances that are beyond the control of the party invoking it and which could not have been avoided despite all the care and attention exercised.

**General Conditions of Carriage** mean these General Conditions of Carriage.

**IATA (International Air Transport Association)** means the International Air Transport Association, created in April 1945 in Montreal, the purpose of which is to encourage the development of safe, regular and economical air carriage and to promote air services and study the problems related thereto.

**Identification Form** means a tag issued by the Carrier for the sole purpose of identifying Checked Baggage and that includes a portion that is affixed to the Baggage ("Baggage Tag") and another portion that is issued to the Passenger for the identification of said Baggage ("Baggage Check").

**Interior Flight or Domestic Flight** means any flight for which the Place of Departure and Place of Destination are within the same State, within territorial continuity.

**International Agreements (IIA and MIA) of the International Air Transport Association (IATA)** mean the inter-carrier agreements on the liability of air carriers, signed on 31 October 1995 in Kuala Lumpur (IIA) and on 3 April 1996 in Montreal (MIA), which are applicable to carriers that have been members of the International Air Transport Association (see IATA) since 1 April 1997, and that are included in the legal scope of the international sources of law on carrier liability referred to under points (a) to (d) of the term "Convention" defined below.

**International Flight** means, as defined by the Convention, any flight for which the Place of Departure and Place of Destination and, possibly, the Stopover, are located on the territory of at least two States that are parties to the Convention, notwithstanding Agreed Stopping Places or aircraft changes, or within a single State if a Stopover is scheduled in another State regardless of whether said other State is or is not party to the Convention.

**Issue Fees (or Ticketing Fees)** means fees charged, where applicable, to the Passenger by the Carrier or its Authorised Agent, in consideration for issuing a Ticket. The amount of said fees is determined by the issuer of the Ticket (the Carrier or the Authorised Agent, as appropriate). The Issue Fees charged by KLM, if any, are available from the Carrier and on the KLM Website.

**Itinerary and Receipt** (see Travel Memo)

**KLC** means the private limited liability company KLM Cityhopper B.V, incorporated under the laws of the Netherlands, having its statutory seat and registered office in (1117 CH) Schiphol, the Netherlands at Stationsplein 102, Convair Building, registered under number 34035358 in the trade register of the chamber of commerce and industry, Amsterdam, The Netherlands.

**KLM** means the limited liability company Koninklijke Luchtvaart Maatschappij N.V., incorporated under the laws of the Netherlands, having its statutory seat and registered office in (1182 GP) Amstelveen, the Netherlands at the Amsterdamseweg 55, registered under number 33014286 in the trade register of the chamber of commerce and industry, Amsterdam, The Netherlands.

**KLM Flight** includes all flights or parts of a flight for which the KLM Designator Code ("KL") is stated on the Ticket or the corresponding Coupon and where KLM or KLC is the Actual Carrier.

**KLM Website** means the website www.klm.com .

**Package Travel** has the same meaning as "Package" as given in Council Directive 90/314/EE of 13 June 1990 on package travel, package holidays and package tours.

**Passenger** means any person, except members of the crew, who was carried, is being carried or is to be carried and who is in possession of a Ticket.

**Passenger Coupon** means the portion of the Ticket, issued by the Carrier or in its name, which is identified as such and must be retained by the Passenger.

**Passenger with Reduced Mobility** means any person whose mobility when using transport is reduced due to any physical disability (sensory or locomotor, permanent or temporary), intellectual disability or impairment, or any other cause of disability, or age, and whose situation needs appropriate attention and the adaptation to his or her particular needs of the service made available to all Passengers.

**Pet** means a pet, in the cabin or hold, travelling with a Passenger who is either the owner or an individual assuming responsibility on behalf of the owner during the journey.

**Place of Departure** means the place of departure as shown on the Ticket (for example airport, railway station or such other place of departure shown on the Ticket).

**Place of Destination** means the place of destination as shown on the Ticket (for example airport, railway station or such other place of destination shown on the Ticket).

**Reservation** means any request for carriage by a Passenger recorded by the Carrier or its Authorised Agent.

**Schedules or Schedule Indicators** means the list of departure and arrival times for the flights, as shown in the schedule guides published by the Carrier, or under its authority, and brought to the attention of the public by electronic means.

**Schedule Indicators** (see Schedules)

**Special Conditions** form part of the General Conditions of Carriage. Special Conditions contain the applicable rules that arise from local laws and regulations and that apply specifically in a particular country or region. Special Conditions may therefore deviate from the General Conditions of Carriage. You are expected to always read both the General Conditions of Carriage and the applicable Special Conditions of the country or region where you book your ticket.

**Special Declaration of Interest** means the declaration made by the Passenger when handing over the Baggage to be checked, which specifies a value that is higher than that fixed as a liability limit by the Convention, against payment of a surcharge.

**Special Drawing Right (SDR)** means a unit of account of the International Monetary Fund (IMF) the value of which is periodically defined by the IMF on the basis of the listed prices of several reference currencies.

**Stopovers** mean the points, with the exception of the Place of Departure and Place of Destination, shown on the Ticket or mentioned in the Schedules as stopovers planned on the Passenger's itinerary.

**Taxes** mean fees, taxes and charges imposed by governments, an airport operator or any other authority as defined in Article 4 below.

**Ticket** means a document which may be completed by a Baggage Check or an Identification Form for Checked Baggage, or by equivalent means in a dematerialised form, including electronic, that is issued or authorised by the Carrier or its Authorised Agent. The Ticket evidences the Contract of Carriage, includes the Flight Coupons, the Passenger Coupons, notices to passengers and incorporates these General Conditions of Carriage.

**Transavia** means Transavia Airlines C.V., a limited partnership incorporated under the laws of the Netherlands, having its statutory seat and registered office in (1117 EE) Schiphol, The Netherlands at the Piet Guilonardweg 15, registered under number 34069081 in the trade register of the chamber of commerce and industry, Amsterdam, The Netherlands.

**Travel Memo (or Itinerary and Receipt)** means one or more documents that the Carrier issues to the Passenger, that confirm(s) the issue of an Electronic Ticket that bears his/her name, information on the flight and notices to Passengers.

**Unchecked Baggage or "Cabin Baggage"** means all Baggage, other than Checked Baggage. This Unchecked Baggage remains in the custody of the Passenger.


## ARTICLE 2: SCOPE OF APPLICATION

### 2.1 General Provisions
(a) Except as provided in Article 2.2 and Article 2.4 below, these General Conditions of Carriage apply to all flights, or portions of flights, for which the KLM Designator Code ("KL") appears on the Ticket or on the corresponding Coupon.
(b) These General Conditions of Carriage also apply to free or reduced-fare carriage, except as otherwise provided for in the Contract of Carriage or in any other contractual document that links KLM to the Passenger.
(c) All Carriage is subject to the General Conditions of Carriage to the Carriers' fare regulations in force at the time of the Passenger's Reservation.
(d) These General Conditions of Carriage have been drawn up pursuant to the Montreal Convention of 28 May 1999 and the European law in force.
(e) These General Conditions of Carriage are available from KLM and its Authorized Agents and are accessible on the KLM Website.

### 2.2 Charters and Code Shares
(a) Certain flights provided by the Carrier are subject to a Charter or a Code Share Agreement.
(b) The Passenger is informed of the identity of the Actual Carrier(s), at the time when the Contract of Carriage is concluded. Following conclusion of the Contract of Carriage, a Carrier other than the one specified on the Ticket may operate the Air Carriage in question and the Passenger shall be informed of the identity of the Actual Carrier, once it is known. In all cases, the Passenger shall be informed, at the latest during check-in, or in case of a connection without prior check-in, prior to boarding, in accordance with the applicable regulations.

### 2.3 The Contingency Plan for lengthy tarmac delays
The Contingency Plan for lengthy tarmac delays applicable within the United States is that of the Carrier actually operating the flight (Actual Carrier).

### 2.4 Predominance of the Law
These General Conditions of Carriage are applicable to the extent that they are not contrary to mandatorily applicable Conventions, Regulation, laws and regulatory requirements or the rules governing public order, in which case, said laws or rules shall prevail. Any invalidation of one or more provisions of these General Conditions of Carriage shall not have any effect on the validity of other provisions, except where the Contract of Carriage could not continue to apply without the provision that has been declared invalid and ineffective.


## ARTICLE 3: TICKETS

### 3.1 General Provisions

(a) Subject to proof of the contrary, the Ticket evidences the existence, the conclusion and the content of the Contract of Carriage between the Carrier and the Passenger whose name is shown on the Ticket.

(b) The Carriage service is only provided to the Passengers named on the Ticket. The Carrier reserves the right to check the identity documents of the Passengers. Passengers must therefore be able to provide the Carrier with proof of their identity, as well as the identity of those for whom they are responsible, at any time during their journey.

(c) A Ticket may not be transferred, subject to applicable law and regulations in force, in particular relating to Package Travels. If a person other than the Passenger named on the Ticket presents a Ticket for Carriage or refund purposes, and the Carrier, acting in good faith, carries or refunds the person who presents the Ticket and later on it is established that that person is not the Passenger named on the Ticket, the Carrier shall not be required to carry the Passenger or refund the Passenger and the Carrier shall have no obligation or liability whatsoever towards the Passenger.

(d) Certain Tickets, which are sold at specific Fares, are partially or totally non –changeable and/or refundable. It is the Passengers responsibility, when making their Reservation, to consult the conditions applicable to the use of the Fare and, where necessary, to take out appropriate insurance to cover the risks associated therewith.

(e) As the Ticket is subject to mandatory formal conditions the Ticket shall at all times remain the property of the issuing Carrier.

(f) With the exception of Electronic Tickets, Passengers shall only be carried if they are able to present a valid Ticket that contains the Coupon that corresponds to the flight concerned and all other unused Coupons, as well as the Passenger Coupon. Moreover, a Ticket that is damaged or has been modified by a person other than the Carrier or one of its Authorized Agents shall not be valid for Carriage. For Electronic Tickets, Passengers must provide proof of identity and shall only be carried on a flight if a valid Electronic Ticket has been issued in their name.

(g) In the event of loss of or damage to all or part of the Ticket or non–presentation of a Ticket containing the Passengers Coupon and all the unused Flight Coupons, the Carrier shall replace all or part of said Ticket on the request of the Passenger. This replacement will be in the form of a newly–issued Ticket, provided that when the request is made, the Carrier has evidence that a valid Ticket was issued for the flight(s) concerned. The Carrier that reissues the Ticket shall charge the Passenger Administration Fees for reissuing their Ticket, unless the loss or damage was due to the negligence of the Carrier, or its Authorised Agent. If no evidence is provided by the Passenger that a valid Ticket was issued for the flights concerned, the Carrier reissuing the Ticket may require the Passenger to pay the Fare Including Tax of the replacement Ticket. This payment will be refunded when the Carrier has proof that the lost or damaged Ticket was not used during its validity period or, if, during said same period, the Passenger finds the original Ticket and submits it to the Carrier, subject to the reasonable Administration Fees as referred to above.

(h) It is the Passenger's responsibility to take all measures which are necessary to ensure that the Ticket is not lost or stolen.

(i) If a Passenger benefits from a fare reduction or a Fare that is subject to specific conditions, the Passenger must be able, at all times during their journey, to provide the Carrier's officials or agents with appropriate supporting documents justifying the granting of this specific Fare, and to prove the validity thereof. Failing this, a fare readjustment, equating to the difference between the Fare including Tax initially paid and the Fare Including Tax that the Passenger should have paid, will be made or the Passenger will not be allowed to board the aircraft.

### 3.2 Validity Period

(a) Unless otherwise provided for on the Ticket or in these General Conditions of Carriage, and except for Fares that affect the validity period of a Ticket, as stated on the Ticket itself, a Ticket is valid for Carriage:

- for one year, as from the date of issue thereof, or,
- for one year, as from the date of use of the first Coupon, provided that such use occurs within one year of the date on which the Ticket is issued.

(b) If a Passenger in possession of a valid Ticket is unable to travel during the validity period of their Ticket solely on the ground that, when the Passenger requests a Reservation on a flight, the Carrier is not in a position to confirm the Reservation requested by the Passenger:

- either the validity of said Ticket shall be extended until the first available flight;
- Fare Including Tax for the Ticket will be refunded, under the conditions provided for in Article 14 (Refunds) below;
- or the Passenger will accept a corresponding fare readjustment.

(c) If, after having started their journey, a Passenger is prevented, for health reasons, from continuing such journey during the validity period of the Ticket, the Carrier will extend the validity of the Ticket until the date on which the Passenger is once again in the position to travel or, if later, until the date of the first available flight, upon presentation of an appropriate medical certificate stating the health reasons that prevented the Passenger from continuing their journey and provided that these health reasons were not known when the Reservation was made. Said extension shall only start at the point at which the journey was interrupted and shall be valid for Carriage in the class of the Fare initially paid. The validity of the Ticket shall be extended for not more than three months from the date shown on the medical certificate submitted. In the same way and subject to compliance with the conditions of proof specified above, the Carrier may, on request, extend the validity of Tickets of immediate family members who were accompanying the Passenger at the time such health problems caused the Passenger to discontinue their journey.

(d) In the event of the death of a Passenger during a journey, the Tickets of the persons who are accompanying the deceased Passenger shall at written request be changed of such Passengers, either by waiving any minimum stay requirements or by extending the validity period of said Tickets. In the event of the death of an immediate family member of a Passenger whose journey has started, the validity of their Tickets and of those of the members of their immediate family travelling with them shall be changed in the same way. Any change mentioned above may only be made after receipt of a valid death certificate. The extension mentioned above shall only start at the point at which the journey was interrupted and shall be valid for carriage in the class for which the Fare Including Tax has been paid. Any extension may not exceed forty-five (45) days as from the date of death.

### 3.3 Force Majeure invoked by a Passenger

If a Passenger has a Ticket, as described in Article 3.1 (d) above, which they have not used in whole or in part for reasons of Force Majeure, the Carrier shall provide the Passenger with a credit voucher corresponding to the Fare Including Tax of their non-refundable and/or non- changeable Ticket which is valid for one year, to be used for a subsequent journey on the Carrier's flights and subject to the applicable Administration Fees, provided that the Passenger informs the Carrier as soon as possible and provides proof of such instance of Force Majeure.

### 3.4 Flight Coupon Order of Use

Please note that depending on your residency and/or destination, the below described policy may not apply to some Passengers and different rules may apply. It is therefore essential that Passengers consult the "Special Conditions" available on the KLM website of their place of residence, which form an integral part of these General Conditions of Carriage.

(a) The Fare including Tax, established on the basis of the details, flight dates and routes mentioned on the Ticket, corresponds to a Place of Departure and a Place of Destination, via a Stopover scheduled when the Ticket was purchased and forms integral part of the Contract of Carriage. The Fare applied on the Ticket issue date is only valid for a Ticket used fully and in the sequential order of Flight Coupons, for the specified journey and on the specified dates.
(b) Except in case of Force Majeure, any non-compliant use by the Passenger (for example, if the Passenger does not use the first Coupon or if the Coupons are not used in the order in which they were issued) will result in the payment of an extra fixed fee at the check-in moment for the following Coupon (from 30 hours before the departure) at the call center, at a City Ticket Office or at the airport amounting to: €125 for flights in Economy Class within Europe and between Europe and Israel, €300 for flights in Business Class within Europe and between Europe and Israel, €500 for intercontinental flights in Economy Class and €1,500 for intercontinental flights in Business Class (or the equivalent in the local currency).
(c) The extra fee will not be applicable when the Passenger, after missing his/her flight, can demonstrate that he/she has used a new ticket on the same route, issued within 24 hours following the departure of the flight corresponding to the unused Coupon.

### 3.5 Changes Requested by a Passenger
Changes that the Passenger wishes to make are subject to the fare conditions attached to their Fare and to payment of the applicable Administration Fees.

### 3.6 Identification of the Carrier
Carrier's identification may be shown as an abbreviation on the Ticket using its Designator Code (as defined in Article 1). The Carrier's address is deemed to be that of any one of its registered offices or principal place of business.


## ARTICLE 4: FARES, FEES, TAXES AND CHARGES
### 4.1 Fares
Except as otherwise provided for, Fares for Tickets apply solely to Carriage from the airport at the Place of Departure to the airport at Place of Destination. Fares do not include ground carriage between airports or between airports and town terminals. The Fare shall be calculated in accordance with the Fares in force on the Ticket Reservation date, for a journey scheduled on the dates and for the itinerary shown on said Ticket. Any change in itinerary or journey date may have an impact on the applicable Fare.
The applicable Fares are those published by the Carrier or calculated thereby, in accordance with the fare conditions in force for the stated flight(s) from the Place of Departure to the Place of Destination, for the relevant class of carriage, on the Ticket Reservation date.
When making a Reservation the Passenger shall be informed of the Fare Including Tax for the Ticket and the Issue Fees as well as the overall Fare of the Ticket (comprising the Fare Including Tax and the Issue Fees).

## 4.2 Fees, Taxes and Charges

All fees, taxes, or charges imposed by governments, by any other authorities or by the airport operator shall be paid by the Passenger. To the extent possible when making a Reservation for their Ticket, Passengers will be informed of said fees, taxes, or charges, which will be charged in addition to the Fare Excluding Tax and which, in most cases, will be shown separately on the Ticket.

These fees, taxes, and charges may be created or increased by a government, another authority, or by an airport operator, after the Reservation date. In this case, the Passenger must pay the corresponding amount. Inversely, if the fees, taxes, and charges are reduced or abolished, the Passenger may be refunded for the reduced or abolished amounts. As soon as a Passenger has a paid and received a Ticket then aforementioned fees, taxes and charges will not be charged or deducted.

## 4.3 Issue Fees charged by the Carrier

The Passenger may be charged Issue Fees in consideration for issuing a Ticket. Issue Fees differ depending on the type of journey, the Fare and the Ticket distribution channel. These Issue Fees are added to the Fare Including Tax. The Issue Fees charged by the Carrier, where applicable, are non–refundable, except where a Ticket is cancelled due to an error on the part of the Carrier. The Passenger shall be informed of the amount of Issue Fees that will be charged by the Carrier prior to finalization of their Reservation.

The Issue Fees charged by KLM, if any, is available from the Carrier and on the KLM Website.

## 4.4 Payment Currency

The Fares Excluding Tax, Taxes, Issue Fees and Administration Fees are payable in the currency of the country where the Ticket was purchased, unless another currency is specified by the Carrier or its Authorised Agent when the Ticket is purchased or beforehand (for example, due to local currency not being convertible).

Moreover, the Carrier may, at its discretion, accept payments in another currency.

## ARTICLE 5: RESERVATIONS

## 5.1 General Provisions

Reservations will only be confirmed when they are recorded in the Carrier's computerized reservation system. On the request of the Passenger, the Carrier shall provide a Reservation confirmation.

## 5.2 Reservation Requirements

Certain Fares are subject to conditions that limit or exclude the possibility of modifying or cancelling Reservations. If a Passenger has not paid all amounts due for the Ticket before the specified ticketing time limit indicated by the Carrier or its Authorised Agent, the Carrier shall be entitled to cancel the Reservation without notice and to allocate the seat to another Passenger, without having any further obligation towards the relevant Passenger who had not paid and with any liability on the part of the Carrier.

## 5.3 Seat Allocation

The Carrier shall make reasonable efforts to meet seat allocation requests but cannot guarantee the allocation of a given seat, even if the Reservation is confirmed for said seat. The Carrier

reserves the right to change the seat allocation at any time, including after boarding, for operating, security or safety reasons, or for reasons of Force Majeure.

### 5.4 Service on board
The Carrier shall make reasonable efforts to meet Passengers' requirements regarding the services provided on board the aircraft, in particular drinks, special meals, films, seats etc. However, the Carrier may not be held liable if imperatives relating to operating, safety and security or reasons beyond the control of the Carrier do not allow it to provide suitable services, even if such services are confirmed at the time of Reservation.

### 5.5 Aircraft type
The type of aircraft indicated to the Passenger at the time of Ticket Reservation or subsequently is given for their information purposes only. Imperatives related to safety and security, reasons beyond the control of the Carrier or operating constraints may lead the Carrier to modify the type of aircraft without any liability on its part.

## ARTICLE 6: PERSONAL DATA
All personal data of the Passenger are collected and processed by KLM with due observance of the KLM privacy policy.

## ARTICLE 7: SPECIAL ASSISTANCE
**7.1**  The carriage of unaccompanied children, Passengers with Reduced Mobility, and persons with illnesses or any other persons who require special assistance, may be subject to special conditions. In certain situations the carriage shall only be performed subject to the Carrier's prior consent. The Carrier reserves the right to require a medical certificate with regard to particular medical conditions. Acceptance for carriage of pregnant women may be subject to prior arrangement with Carrier. The special conditions relating to the carriage of Passengers as referred to in this Article 7.1 are available from the Carrier and its Authorised Agents on request and on the KLM Website.

It is advisable for Passengers to inform the Carrier of their disability or of any need for special assistance when making their Reservation. Should a request for special assistance be made following Reservation or in accordance with the applicable regulations, less than 48 hours prior to departure, the Carrier will do everything in its power to fulfil the request pursuant to the applicable regulations, taking particular account of the time frame and the specific nature of the assistance requested. Should the Passenger, when checking in or boarding, require special assistance for which a request has not timely and in accordance with this Article been made, then the Carrier has the right to refuse the Passenger pursuant to Article 9 (o).

**7.2**  If a Passenger requires a special meal, they must enquire as to the availability thereof when making the Reservation (and/or changing a Reservation) or within the time limits published by the Carrier for this purpose. Otherwise, the Carrier cannot guarantee the presence of said special meal on board the flight concerned.

**7.3**  If a Passenger has a medical background or a specific medical condition which may be affected by travelling in a pressurized cabin, it is recommended that the Passenger consults a doctor before taking a flight, particularly a long-haul flight, and take all necessary precautions for their flight to take place without incident.

**7.4**  If the Passenger fails to inform the Carrier of a mental or physical condition, or incapacity within the meaning of Article 7.1, and in connection with that condition the Carrier diverts the aircraft to an unscheduled place of destination, the Carrier is entitled to recover the reasonable costs of the diversion and other related costs from the Passenger, unless in case of Force Majeure on the side of the Passenger.


## ARTICLE 8: CHECK−IN/BOARDING

**8.1**  Check−In Deadlines (CID) vary from one airport to another. Passengers must imperatively comply with Check−In Deadlines in order to facilitate their journey and avoid their Reservations being cancelled. The Carrier or its Authorised Agent shall provide Passengers with all requisite information on the Check−In Deadline for their first flight with the Carrier. If the Passenger's journey includes subsequent flights, it is the Passenger's responsibility to check they are in possession of all the information relating to Check−in Deadlines for these flights.

**8.2**  Passengers must arrive sufficiently in advance of the flight in order to be able to carry out all necessary formalities for their journey; in any event, they must comply with the Check−In Deadline. Should the Passenger fail to do so or should the Passenger not present all the documents allowing them to be checked-in and therefore be unable to travel, the Carrier may cancel Passenger's Reservation and seat reserved for such Passenger, without having any further obligation towards the relevant Passenger and without any liability on the part of the Carrier.

**8.3**  Passengers must be present at the boarding gate prior to the boarding time specified at check−in. The Carrier shall be entitled to cancel a Passenger's Reservation and seat reserved for such Passenger if the Passenger is not present at the boarding gate at the latest by the boarding time specified to the Passenger, without having any further obligation towards the relevant Passenger and without any liability on the part of the Carrier.

**8.4**  The Carrier shall have no obligation (including, without limitation, no obligation to carry or pay a refund) or liability whatsoever towards a Passenger who has not complied with the conditions of this Article.


## ARTICLE 9: REFUSAL AND LIMITATION ON CARRIAGE
**9.1 Immediate refusal**

The Carrier may refuse to transport Passengers and their Baggage, if one or more of the following cases has occurred or is likely to occur:
(a) Carrier in its reasonable discretion determines that such action is necessary in order to comply with any applicable laws, regulations or orders of any state or country to be flown from, into or over.
(b) The Passenger has expressed himself in such a way or displayed such behaviour that (i) doubt exists with respect to safety and/or (ii) the Carrier, its crew and/or ground staff, its aircraft/assets and/or property, its services (including any loyalty programme of the Carrier) or its Passengers has suffered any damage, either direct or indirect. Such expression or behaviour includes the use of threatening, abusive or insulting language towards ground staff or crew and Passengers threatening to endanger or who have already endangered the safety, health and/or hygiene of one

or more persons, goods or the aircraft itself (which includes those who make a hoax bomb threat.

(c) The Passenger's physical or mental state, including any condition caused by the consumption of alcohol or the use of drugs or medication, could present discomfort, a hazard or risk to themselves, the other Passengers, the crew or property.

(d) The Passenger is, or appears to be in the unlawful possession of drugs.

(e) The Passenger has compromised security, order and/or discipline before the flight or, for connecting flights, during a previous flight and the Carrier has reason to believe that such conduct may be repeated.

(f) Immigration and/or customs authorities and/or any other government authority informed the Carrier (either orally or in writing) that the Passenger is not allowed to travel and/or the Carrier has notified the Passenger (either orally or in writing) that the Carrier will not carry the Passenger on his flights, for a certain period or forever. This includes situations in which the Carrier has received a negative travel advice regarding the Passenger from such authority, for example in cases where the Passenger is suspected of (intent to) drug smuggling and situations where the authorities have notified the Passenger in writing that the Carrier shall no longer carry the Passenger on its flights.

(g) The Passenger has refused to undergo the security as outlined in particular in Articles 10.1.3 and 18.6 below or has refused to provide proof of his identity.

(h) The Passenger is not in a position to prove that they are the person referred to in the box "Passenger name" box on the Ticket.

(i) The Passenger (or the person who paid for the Ticket) has not paid the Fare Including Tax in force and/or the applicable Issue Fees and/or Taxes.

(j) The Passenger does not appear to be in possession of valid travel documents, may seek or has sought to illegally enter a country through which he may be in transit, or for which he does not have a valid entry document, has destroyed travel documents during the flight, has refused to allow copies thereof to be made and kept by the Carrier, or the Passenger's travel documents have expired, are incomplete in light of the regulations in force, or appear to be fraudulent or otherwise suspicious (for example: identity theft, forgery or counterfeiting of documents).

(k) The Ticket presented by the Passenger:
- appears to be invalid, or
- was acquired unlawfully or purchased from an organisation other than the Carrier or its Authorised Agent, or
- has been reported as stolen or lost document, or
- has been forged or appears to be counterfeited, fraudulent or otherwise suspicious, or
- has a Flight Coupon that has been damaged or modified by someone other than the Carrier or its Authorised Agent.

(l) The Passenger refuses to pay an extra fixed fee under the conditions specified in Article 3.4 above.

(m) The Passenger refuses to pay a surcharge under the conditions specified in Article 10 below.

(n) When checking in or boarding, the Passenger requires special assistance that was not requested when the travel Reservation was made, or in accordance with the applicable regulations, at least 48 hours before the announced departure time of the flight, in accordance with Article 7.1, and which the Carrier cannot reasonably provide.

(o) The Passenger has not complied with the instructions and regulations relating to security, safety and/or health.

(p) A Passenger benefiting from a fare reduction or a Fare that is subject to specific conditions, is

unable to provide the supporting documents required for the allocation of this specific Fare and refuses to pay the Fare readjustment defined in Article 3.1 (i).
 In cases (h), (j), (k), (l), and (m) above, the Carrier shall be entitled to cancel the Passenger's Ticket. In the cases of (f), (i) and (k) the Carrier has the right to refuse a refund of the Ticket of the Passenger as defined in Article 14.4 (f), without the Carrier incurring any liability as a result.

### 9.2. Decision to restrict or refuse admission on board KLM Flights
If the Passenger has (seriously) jeopardized the safety, good order and/or discipline before a previous KLM Flight or during a previous KLM Flight, KLM may, at its sole discretion, decide to:

(a) attach additional conditions to the admission of the Passenger and his/her Baggage on board KLM Flights for period of three years; or

(b) refuse the Passenger and his/her baggage on board KLM Flights for a period of, in principle, five years.

### 9.3 Aggravating circumstances
With regard to Article 9.2 (b), in the event of aggravating circumstances (such as repeated misbehavior) KLM may decide in a specific case to refuse the Passenger and his/her Baggage for more than five years. In very severe cases KLM may decide to permanently refuse the Passenger and his/her Baggage.

### 9.4 Decision to refuse on board Transavia flights and KLM Flights
If the Passenger has (seriously) jeopardized the safety, good order and/or discipline before a Transavia flight or during a Transavia flight and consequently and at its sole discretion Transavia has decided to refuse the Passenger and his/her Baggage for a period of, in principle, five years, or in the event of aggravating circumstances, longer or permanently, on board Transavia flights, KLM may decide to refuse the Passenger and his/her Baggage on board for the same period on board KLM Flights.

**9.5** In the above cases under Article 9.2, Article 9.3 and Article 9.4, KLM has the right to cancel the Passenger's Ticket as well as the right to refuse refund of the Passenger's Ticket as provided in Article 14.4 (f). In the aforementioned cases, KLM is not committed to anything and is not liable in any way.


## ARTICLE 10: BAGGAGE
### 10.1  General Provisions
### 10.1.1  Passenger's Obligations
(a) Passengers declare that they are fully aware of the content of all of their Baggage.
(b) Passengers undertake not to leave their Baggage unattended from the moment they pack it and not to accept items from another Passenger or from any other person.
(c) Passengers undertake not to travel with Baggage entrusted to them by a third party.
(d) Passengers are advised not to include perishable or fragile items in their Baggage. If however the Passenger includes such items or objects in their Baggage, they must ensure that that these are properly and securely packed and protected in suitable containers in order not to damage these items and objects as well as Baggage belonging to other Passengers' Baggage or the Carrier's aircraft.

## 10.1.2  Prohibited Items

Passengers shall not include in their Baggage any items for which carriage is prohibited or restricted by the applicable regulations and the law in force in any departure, arrival or transit State or State over which the aircraft flies, including in particular:

(a) Items that are liable to endanger the aircraft, the persons or property on board, such as those specified in the Dangerous Goods Regulations of the International Civil Aviation Organisation (ICAO) and the International Air Transport Association (IATA) and in the Carrier's regulations, as applicable (additional information is available upon request from the Carrier); these items include in particular but is not limited to, asbestos, explosives, pressurised gas, oxidising, radioactive or magnetised substances, inflammable substances, toxic or corrosive substances articles, liquids or other substances which are capable of posing a significant risk to health, safety or property when transported by air.

(b) Items which in the reasonable opinion of the Carrier are unsuitable for Carriage because of the weight, dimensions, unpleasant odour, configuration or fragile or perishable nature, make them unsuitable for Carriage, in particular in light of the type of aircraft used. Information on these items shall be provided to Passengers, upon request;

(c) Firearms and ammunition other than those intended for hunting or sport which, in order to be accepted as cargo or Checked Baggage, must be unloaded and suitably packed and have the safety catch on. The carriage of ammunition is subject to the ICAO and IATA Dangerous Goods Regulations, as stated in paragraph (a) above;

(d) Products of animal origin. This includes (parts of) animals that are the result of hunting.

(e) Cutting weapons, stabbing weapons and aerosols that may be used as attack or defense weapons, antique weapons, replica of weapons, swords, knives and other weapons of this type. This type of weapon may not be transported in the cabin under any circumstances. They may nevertheless be contained as cargo or Checked Baggage, subject to acceptance by the Carrier.

(f) Live animals, except as provided for in the provisions of Article 10.4.

Furthermore, additional information on prohibited items which may not be carried as Unchecked Baggage, including but not limited to carriage liquids and gels as well as pointed/edged weapons and sharp objects, blunt instruments and lighters, are available from the Carrier and on the KLM Website.

## 10.1.3  Right of Search

For security/safety reasons, and/or on the request of the authorities, the Passenger may be asked to undergo for themselves and/or their Baggage, a search or any type of scan (using X–rays or another technique). If a Passenger is not available, their Baggage may be scanned or opened and manually checked in their absence, with a view to checking, in particular, whether it contains the items referred to in Article 10.1.2 above. If a Passenger refuses to comply with such requests, the Carrier may deny them and their Baggage carriage. If said scans damage the Baggage and the contents thereof or cause Damage, the Carrier shall not be liable, unless the Damage is caused by the Carrier's gross negligence or willful misconduct.

## 10.1.4 Right to Refuse Carriage to Carry Baggage

(a) The Carrier may, for security and/ or safety reasons, refuse to carry or continue to carry a Passenger's Baggage if it contains any of the items listed in Article 10.1.2 above or if the Passenger has failed to comply with the obligations of Article 10.1.1(a), (b) and (c). The Carrier has no obligation to take custody of refused Baggage and/or items.

(b) The Carrier may, in particular for security, safety, hygiene and/ or operating reasons, refuse to carry any item that is incompatible with Air Carriage because of its dimensions, shape, weight, contents, configuration or nature, or refuse to continue to carry them should they be discovered during a journey. The Carrier has no obligation to take custody of refused Baggage and/or items.

(c) The Carrier may refuse to carry Baggage for which the Passenger has refused to pay the surcharge as defined in Article 10.2.2 (b). The Carrier has no obligation to take custody of refused Baggage or items.

(d) The Carrier will not agree to carry animals that do not have the documents required by the applicable regulations such as defined in Article 10.4.

(e) The Carrier may refuse to carry in the hold Baggage that has not been handed over by the Passenger to the Carrier prior to the Check-in Deadline under the conditions defined in Article 10.2.1 (a).

## 10.2 Checked Baggage

### 10.2.1 General Provisions

(a) The Passenger must hand over Baggage at the Carrier's check-in desk or at the self-service drop off point for the purpose of checking in prior to the Check-in Deadline.

(b) As soon as Passengers have handed over their Baggage at check-in, under the aforementioned conditions, the Carrier shall take custody thereof and issue Passengers with a Baggage Check, for each item that of Checked Baggage.

(c) Passengers must affix their name to their Baggage.

(d) Carrier will try, as much as reasonable possible, to arrange that Checked Baggage is carried on the same aircraft as the Passenger. Amongst others, for operating or security/safety reasons, the Checked Baggage may be carried on another flight. In this case, the Carrier will deliver the Baggage to the Passenger, unless the applicable regulations require the Passenger to be present for a customs inspection.

(e) Checked Baggage must be able to withstand normal handling and protect its content.

(f) Passengers are advised not to put in their Baggage currency, jewellery, works of art, precious metals, silverware, securities, or other valuables, optical or photographic equipment, computers, electronic and/ or telecommunication equipment or devices, musical instruments, passports and identity documents, keys, business documents, manuscripts or deeds, whether individualized or fungible etc. In this respect, it is specified that in the event of destruction, loss or damage of Checked Baggage, the Carrier will only be liable to the extent defined by the Convention and Article 19 of these General Conditions of Carriage.

(g) Subject to applicable regulations, Passengers are advised not to carry any medication in their Checked Baggage.

(h) If the Passenger prematurely interrupts their journey, the Passenger will be required to pay a fixed fee of €275 at Amsterdam Schiphol Airport and at Charles de Gaulle (Paris), in order to be able to retrieve their Checked Baggage. The aforementioned does not apply in case of Force Majeure.

### 10.2.2  Baggage Allowance

(a) Where applicable according to fare conditions the Baggage Allowance corresponds to carriage in the hold of a quantity of Baggage per Passenger limited in number and/or weight and/or dimensions, determined on the basis of the destination and the Fare paid and appearing on the Ticket.

(b) Passengers may travel with Checked Baggage that exceeds the Baggage Allowance, subject to

payment of a surcharge. The conditions relating to this surcharge are available from the Carrier and its Authorised Agents and on the KLM Website.

(c) In all cases, the Checked Baggage may not exceed a maximum number per Passenger. Information relating to this maximum number is available from the Carrier and its Authorised Agents and on the KLM Website.

(d) Passengers can obtain all relevant information about the applicable Baggage Allowance, if any, from the Carrier or its Authorized Agent and the KLM Website.

### 10.2.3  Special Declaration of Interest

(a) For all Checked Baggage with a value that exceeds the liability limits in the event of destruction, loss, damage or delay, as defined by the Convention, Passengers can either purchase insurance coverage prior to the journey or, when handing over the Baggage to the Carrier, make a Special Declaration of Interest limited to a certain amount. In this case, a surcharge made known upon request, must be paid by the Passenger. Compensation will be paid in accordance with the provisions of Article 19.

(b) The Carrier reserves the right to verify the adequacy of the value declared with the value of the Baggage and the contents thereof.

(c) All Special Declarations of Interest must be made by the Passenger to the Carrier prior to the Check-in Deadline. The Carrier may refuse any Special Declaration of Interest if a Passenger does not comply with the afore mentioned time limit. The Carrier also has the option of capping the level of the declarations. The Carrier also reserves the right to prove, in the event of damage, that the amount declared was higher than the Passenger's genuine interest at the time of delivery.

(d) All the relevant information regarding this Special Declaration of Interest and surcharge specified in Article 10.2.3 above can be obtained from the Carrier.

### 10.2.4  Collection and Delivery of Baggage

(a) Subject to the provisions of Article 10.2.1 (d), it is the responsibility of Passengers to collect their Checked Baggage as soon as made available to them at the Place of Destination or Stopover. If a Passenger does not collect Baggage within three months from the Baggage being made available to them, the Carrier may dispose of said Baggage, without being liable to the Passenger in any way.

(b) Only the bearer of the Baggage Check is authorised to collect Checked Baggage.

(c) If a person claiming Baggage is not in a position to produce the Baggage Check, the Carrier shall only hand over the Baggage to such person on the condition that he/she establishes his/her rights thereto in a satisfactory manner.

(d) Receipt of the Baggage by the bearer of the Baggage Check without complaint is prima facie evidence that the same has been delivered in good condition and in accordance with the Contract of Carriage (subject to proof to the contrary by the Passenger).

(e) For the collection of Checked Baggage in the event of prematurely interruption of the journey, the provisions under Article 10.2.1 (h) apply.

### 10.3  Unchecked Baggage

(a) All Tickets allow for carriage in the cabin of a quantity of Unchecked Baggage which is limited by number and/or weight and/or dimension. Should this information not have been specified to the Passenger, a single Unchecked Baggage item will be accepted and Unchecked Baggage must be able to be placed beneath the seat, in front of Passengers or in a locker provided for this purpose.  Should the Carrier be required to check Baggage into the hold as a result of a failure on

the part of the Passenger to comply with the above conditions, the Passenger may be required, where applicable, to pay a surcharge, as specified in Article 10.2.2 (b).
 Certain Baggage which the Passengers wish to take in the cabin, may, for security and/or safety and/or operation or aircraft configuration reasons, at any time prior to the flight departure, be denied cabin access and must be carried as Checked Baggage.
(b) The Baggage/items that Passengers do not wish to carry in the hold (such as fragile musical instruments or other items) and that do not comply with the provisions of Article 10.3 (a) above (excess dimensions and/or weight), may only be accepted for cabin carriage if the Carrier has been duly informed thereof by the Passenger prior to check-in and granted authorization. In this case, the carriage of said Baggage may be subject to a charge, in accordance with the Carrier's fare conditions, which can be obtained from the latter.
(c) Passengers are responsible for personal effects and Unchecked Baggage that they take into the cabin. In the event of destruction, theft, loss or damage of personal effects and Unchecked Baggage, the Carrier may only be held liable if wrongdoing on its part, or that of its officials or agents, is proven, said liability being then limited to the amount defined in Article 19 of these General Conditions of Carriage.

## 10.4 Animals
### 10.4.1 General Provisions
(a) Only cats and dogs are allowed to travel as pet in the cabin or in the hold.
(b) The carriage of animals travelling with Passengers is subject to the Carrier's prior and explicit acceptance.
(c) The number of animals that can be carried is limited per flight and per Passenger.
(d) In accordance with the regulations in force, the carriage of certain categories of animals is prohibited. Information relating to these categories is available on request from the Carrier and its Authorised Agent and on the KLM Website.
(e) Passengers must be able to provide all valid documents relating to their animal, required by the authorities in the departure, arrival or transit country, including in particular passports, health and vaccination certificates and entry or transit permits. The Carrier will not agree to carry animals that do not have the requisite documents.
(f) Depending on the destination, the carriage of animals can be subject to conditions, in particular age, weight, health checks, which the Passenger may obtain from the Carrier.
(g) The animal and its container are not included in the Baggage Allowance; the Passenger must pay a surcharge, the conditions of which are available from the Carrier.
(h) Guide dogs, service animals, and if applicable their cages, accompanying Passengers with Reduced Mobility will be carried free of charge, in addition to the applicable Baggage Allowance, in accordance with the Carrier's regulations, which are available on request.
(i) In the event of fraud or the absence or invalidity of the required documents or if the container intended for carrying the animal does not comply with the provisions of Article 10.4.3, the Carrier shall not assume any liability for the injury, loss, delay, illness or death of animals carried (in the event that the animal is refused entry into or passage through any country, state or territory), as a result of these failures, unless this is solely caused by gross negligence or willful misconduct of the Carrier. Passengers travelling with animals who fail to comply with the applicable regulations must reimburse the fines, loss, compensation and all costs and damage incurred by Carrier due to such a situation.
The Carrier shall at all times be entitled to set such additional conditions as it deems appropriate in its discretion.

(j) Passengers can obtain all the relevant information regarding the carriage of animals and in particular, the surcharge specified in Article 10.4.1 (g) above form the Carrier and its Authorised Agent and on the KLM Website.

**10.4.2 Cats and dogs travelling in the cabin**
(a) Pets and their cages will in no event be accepted in the cabin when exceeding a weight fixed by the Carrier. Information relating to the maximum weight is available on request from the Carrier and its Authorised Agent and on the KLM Website.
(b) Pets must be placed in container designed for this purpose, which is closed and fully contains the animal and in which the animal is able to stand up, turn around and breathe easily and freely.
(c) Passenger undertake not to remove Pets, even partially from their containers for the entire duration of the flight.

**10.4.3 Cats and dogs travelling in the hold**
Pets must be placed in a rigid plastic or fibre glass carry cage approved by the IATA (International Air Transport Association).


# ARTICLE 11: SCHEDULES
**11.1** The flights and flight Schedules listed in the Schedule Indicators are not binding in any way and thus have no contractual value. These are solely intended to inform Passengers of the flights offered by the Carrier. Said Schedule Indicators are not definitive and are liable to be changed after their publication date.

**11.2** On the other hand, the flight Schedules printed on the Ticket are deemed, subject to changes for reasons beyond the control of the Carrier, to form an integral part of the Contract of Carriage.

**11.3** In the event of a change in the Schedule Indicators, the Passenger will be informed using the contact details provided when the booking was made. It the Passenger's responsibility to provide the Carrier with their contact details so that they can be contacted in the event of a change in the planned flights as they appear on the Ticket. In the event of a change of the Schedule Indicators and the Passenger decides against Transportation, the Passenger can apply for a refund as stated in Article 14.


# ARTICLE 12: DELAYS AND CANCELLATION OF FLIGHTS
**12.1** The Carrier will take all reasonable measures to avoid delay in carrying the Passenger and their Baggage. In order to prevent a flight cancellation or delay, Carrier may arrange for a flight to be operated on its behalf by an alternative Carrier and/or aircraft and/or other means of transport.

**12.2** In the event of a flight cancellation or delay, the Carrier will implement all the provisions of the applicable regulations. Information relating to passenger rights in case of delays and cancellations is available from the Carrier and its Authorised Agents and on the KLM Website.


# ARTICLE 13: DENIED BOARDING AND DOWNGRADING

**13.1** In the event the Carrier decides to deny boarding the Passenger, due to overbooking or other reasons, with the result that the Carrier is not in a position to offer a seat to the Passenger, even though the Passenger has a valid Ticket and has arrived for check-in and boarding in accordance with the required timeframes and conditions, the Carrier shall grant the Passenger the compensation provided for by the relevant applicable regulations, where applicable.

**13.2** In the event that the Passenger is placed in a lower class than that for which the Ticket was purchased, the Carrier will refund the difference in Fares, under the conditions specified by the relevant applicable regulations. Information relating to passenger rights in case of Denied Boarding and downgrading is available from the Carrier and its Authorised Agents and on the KLM Website.


## ARTICLE 14: REFUNDS

**14.1** The refund of a Ticket, in whole or in part, will take place in accordance with the conditions defined in this Article 14, in accordance with the Ticket's fare conditions and all circumstances with the relevant applicable regulations. If you cancel your flight(s) or if you are refused pursuant to Article 9.1 (f) (i) or (k), Article 9.2, Article 9.3 or Article 9.4 and have a non-refundable ticket Ticket, you can request a refund of unused airport tax. However, with a non-refundable ticket, carrier imposed international surcharges will not be refunded. The booking fee, reissue fee and payment surcharges are non-refundable, regardless of your ticket conditions. For provisions in case of Force Majeure invoked by a Passenger, see article 3.3.

**14.2** A refund, where it is authorized by the Ticket's fare conditions, will be paid on the basis of Fare Including Tax paid for the Ticket.

**14.3** Request for the refund of a Ticket must be submitted to the issuer of the Ticket (the Carrier or Authorised Agent, as applicable).

**14.4** The Carrier shall refuse to grant a refund:
(a) For any Ticket, if the request is made after expiry of the Ticket's validity period.
(b) For a Ticket which meets the legislative or regulatory requirement to possess a Ticket that enables the Passenger to leave the country, unless such Passenger provides sufficient proof to establish that they are authorized to reside in said country or that they will leave using another Carrier, or by any other means of carriage.
(c) For a Ticket, in case the holder is not admitted by the authorities of the Place of Destination, Agreed Stopping Place or Stopover, and if the Passenger was returned to their boarding point or to any other destination for this reason.
(d) For a stolen, forged or counterfeit Ticket.
(e) For Passengers who did not comply with the conditions as stated in Article 8.
(f) For Passengers that are refused Carriage by the Carrier pursuant to Article 9.1 (f), (i) or (k), Article 9.2, Article 9.3 or Article 9.4.

**14.5** Refunds are subject to applicable regulations in the country in which the Ticket was originally purchased and/or to applicable regulations in the country in which the refund must be paid.

## ARTICLE 15: CONDUCT ABOARD THE AIRCRAFT

**15.1** On board the aircraft, Passengers must not behave in a way that is liable to inconvenience, threaten or endanger one or more persons, property or the aircraft itself. Passengers must not hinder the crew from performing their duties and must comply with the crew´s guidance instructions and recommendations in order to ensure the security and safety of the aircraft, the smooth running of the flight and the comfort of the Passengers.

**15.2** For security reasons, the Carrier may prohibit or limit the use on board the aircraft of electronic devices, such as cellular telephones, laptop computers, portable recorders, portable radios, electronic games or transmitting devices, as well as all radio-controlled games and walkie-talkies, except for hearing aids and pacemakers.

**15.3** Smoking (including conventional cigarettes, electronic- or other artificial forms of smoking) is strictly prohibited on board the aircraft.

**15.4** The Carrier may limit or prohibit the consumption of alcohol on board the aircraft. Consumption of any alcoholic beverages carried into the aircraft by Passengers or consumption of any duty free product bought on board the aircraft is prohibited.

**15.5** Recording videos and/or taking photographs other than personal videos and photographs is prohibited on board the aircraft.

**15.6** If a Passenger fails to comply with the provisions of this Article, the Carrier may take all the necessary appropriate and reasonable measures, pursuant to legislative and regulatory provisions, in order to prevent such behavior from continuing. To this end, the Carrier may use restraining measures, disembark the Passenger, refuse onward carriage of the Passenger at any point and attach certain additional conditions to the onward carriage of the Passenger, or report the Passenger to the local authorities.

**15.7** If a Passenger does not comply with the provisions of this Article (and with those of Article 9 relating to carriage refusal and limitation) or commits a criminal or reprehensible act on board an aircraft, the Carrier reserves the right to take legal action against said Passenger and claim damages.

**15.8** If as a result of Passenger's behavior, Carrier diverts the aircraft to an unscheduled place of destination, Passenger must pay the Carrier the reasonable costs of such diversion.


## ARTICLE 16: PROVISIONS FOR ANCILLARY SERVICES

**16.1** If the Carrier, within the scope of the Contract of Carriage and subject to the applicable law, agrees to provide for ancillary services other than carriage by air, or if the Carrier issues a ticket or voucher for carriage or other services, such as, for example, hotel reservations or car hire, the Carrier will only do so as an agent in the name of and for and on behalf of a third party (unless explicitly agreed otherwise) and will not be the Passenger's counterparty for these services. The carriage or sale conditions that govern the activities of said third parties will be applicable.

**16.2** If the Carrier offers a Passenger ground or sea carriage services (train/ bus/ boat etc.), the Carrier is only acting as an agent in the name of and for and on behalf of a third party, even if such carriage is identified under the Designator Code. Different liability systems may apply to said ground

or sea carriage. The conditions of carriage and the liability systems are available, upon request, from the party that provides the ground/ sea carriage. The Carrier is not liable for Damage to Passengers and their Baggage during carriage by rail, road or sea.

## ARTICLE 17: SUCCESSIVE AIR CARRIERS

**17.1** Air Carriage performed by several successive Carriers, under a single Ticket or a Conjunction Ticket, is deemed to constitute a single operation for purposes of determining the application of the Convention to the transportation.

**17.2** Where the Carrier has issued the Ticket or is the Carrier designated first on the Ticket or on a Conjunction Ticket issued for successive Carriage, the Carrier shall not be liable for those parts of the journey performed by other carrier(s), except as provided for in paragraph 3 below.

**17.3** In the event of the destruction, loss or delay of, or damage to Checked Baggage, Passengers or their beneficiaries can file a claim against the Carrier that performed the carriage during which the destruction, loss, delay or damage occurred. Passengers can also file a claim against the first and last Carrier.

## ARTICLE 18: ADMINISTRATIVE FORMALITIES

### 18.1 General Provisions

(a) Passengers are required, under their own responsibility, to procure all the specific documents, visas and permits required for their journey, and where applicable for that of their minor children and/or passengers for who they are responsible and/or for animals travelling with them, and must also comply with all provisions of law (laws, regulations, decisions, requirements and provisions) of the departure, arrival and transit States, as well as with the Carrier's regulations and the instructions relating thereto.

(b) The Carrier shall not be liable for the
consequences suffered by Passengers in the event of failure to comply with the obligations referred to in Article 18.1 (a).

### 18.2 Travel Documents

(a) Passengers are required to present entry, exit and transit documents, as well as health and other documents required by the applicable regulations (laws, regulations, decisions, requirements and provisions) in the departure, arrival and transit States. Passengers are moreover required to hand over to the Carrier and/or allow the Carrier to make a copy of said documents, if required, or to record information contained therein.

(b) The Carrier reserves the right, in accordance with Article 9, to refuse the Carriage if a Passenger fails to comply with the applicable laws and regulations, if the Carrier has doubts as to the validity of the documents presented, or the Passenger does not permit the Carrier to take and retain copies of any documents or otherwise retain data contained in the relevant documents.

(c) The Carrier shall not be liable for losses or expenses suffered by Passengers who do not comply with the provisions of this Article.

### 18.3 Refusal of Entry

If a Passenger is refused entry into a territory, they must pay all the charges or fines imposed on the Carrier by the local authorities, as well as the Fare Including Tax for carriage if the Carrier, due to a government order, is required to return the Passenger to his/her departure location or elsewhere. The price of the Ticket purchased for carriage to the destination for which entry to the territory was refused shall not be refunded by the Carrier. For reasons of safety and good order the captain and/or the escorting police may hold the relevant travel documents of the Passenger under its custody during the flight to his place of departure or elsewhere.

### 18.4 Passenger Liability for Fines, Detention Costs, etc.

If the Carrier has to pay or deposit a fine or penalty or incurs expenses of any kind due to the noncompliance, whether voluntary or involuntary, by a Passenger with the law in force in the countries concerned, or due to their failure to present any required document, or the presentation of invalid documents, the Passenger must, at the Carrier's first request, reimburse the amounts thus paid or consigned and the disbursements incurred. For this purpose, the Carrier may use any amount paid to it for non-performed carriage or any amount belonging to the Passenger that is held by the Carrier.

### 18.5 Customs Inspections

(a) Passengers may be called on to be present at the inspection of their Baggage (delayed, Checked or Unchecked) on the request of customs officers or any other government authority. The Carrier shall not be liable for Damage or losses suffered by Passengers who fail to comply with this provision.
(b) Passengers shall indemnify the Carrier if any action, omission or negligence on their part causes Damage to the Carrier, including, without limitation, any failure to comply with the provisions of this Article or to enable the Carrier to inspect their Baggage.

### 18.6 Security Checks

(a) Passengers are required to undergo the security (and safety) checks required by the government or airport authorities, as well as those requested by the Carrier.
(b) The Carrier cannot be held liable for refusing to carry a Passenger, in particular in the event that such refusal is based on the reasonable view that said refusal is warranted by the applicable law, regulations and/or requirements.


## ARTICLE 19: LIABILITY FOR DAMAGE

### 19.1 General Provisions

The Carrier's liability shall be determined by the Contractual Carrier's General Conditions of Carriage, except as otherwise provided for and brought to the Passenger's attention. If KLM is the Contractual Carrier the following will apply:

**19.1.1** Carriage performed under these General Conditions of Carriage is subject to the liability rules laid down by the Montreal Convention of 28 May 1999, and Regulation (EC) No 889/2002 of the European Parliament and of the Council of 13 May 2002 amending "Council Regulation (EC) No 2027/97 of 9 October 1997 on air carrier liability in the event of accidents, as regards the carriage of passengers and their baggage".

**19.1.2** To the extent that the following provisions do not conflict with the other provisions in these General Conditions of Carriage, and subject to the Convention, the following will apply:
(a) The Carrier's liability is limited to Damage that occurred during Air Carriage for which its Designator Code appears on the Coupon or the Ticket that corresponds to the flight. If the Carrier issues a Ticket for a carriage service performed by another Carrier or if the Carrier checks in Baggage on behalf of another Carrier, the Carrier shall only act as an agent in the name and on behalf of said other Carrier. Provisions in respect of liability in case of successive carriage are laid down in Article 17.3.
(b) The Carrier's liability may not exceed the amount of proven direct Damage and the Carrier shall not be liable, in any way, for consequential Damage or any form of non compensatory Damage.
(c) The Carrier is not liable for Damage that results from compliance by the Carrier with any provisions of the law or regulations (laws, regulations, decisions, requirements and provisions) or a failure to comply with said same provisions by the Passenger.
(d) The Contract of Carriage, including these General Conditions of Carriage and all the liability exclusions or limitations contained therein, shall apply to and benefit the Carrier's Authorised Agents, the Code Share partners of the Carrier, its officials, its agents, its representatives, servants and the owner of the aircraft used by the Carrier, as well as the said owner's staff, employees and representatives of said owner and agents. The overall amount recoverable from the aforementioned persons may not exceed the amount of the Carrier's liability.
(e) If Carrier proves that the Damage was caused or contributed to by the negligence or other wrongful act or omission of the person claiming compensation or whose rights he/she exercises or from whose rights such person derives its right, the Carrier shall be wholly or partially exonerated from its liability to the extent that such negligence or wrongful act or omission caused or contributed to the Damage. This paragraph applies to all the liability provisions in these Conditions of Carriage, including for the sake of clarity Article 19.2.1.
(f) Except as expressly otherwise provided for, none of these provisions constitute a waiver of any exclusion or limitation of the liability of the Carrier, the owner whose aircraft is used by the Carrier, their staff, officials, agents or representatives in accordance with the Convention and mandatory and applicable law.

### 19.2 Provisions Applicable to International and Interior Flights
### 19.2.1 Bodily Injury
(a) Subject to the remainder of this Article 19.2.1 the Carrier is liable for the Damage sustained in the event of the death or bodily injury suffered by a Passenger if caused by an accident that occurred on board the aircraft or in the course of any embarking or disembarking operations as defined by the Montreal Convention.
(b) The Carrier shall not be liable for any Damage in the following circumstances:
If a Passenger is carried whose age or mental or physical condition involves any hazard or risk to himself, Carrier shall not be liable for personal injuries such as illness, injury, disability or death, or any aggravation of such illness, injury or disability, provided such personal injuries are attributable solely to such condition.
(c) For Damages arising under Article 19.2.1 (a) not exceeding 128,821 SDR's for each Passenger, Carrier shall not exclude or limit its liability. However, Carrier shall be entitled to invoke Article 19.1.2 (e). Carrier shall not be liable for Damages under Article 19.2.1 (a) to the extent that they exceed for each Passenger 128,821 SDR's if the Carrier proves that:
(1) such Damage was not caused by negligence or any other wrongful act or omission of Carrier or

its servants or agents; or

(2) such Damage was solely caused by negligence or other wrongful act or omission of the claimant, the Passenger whose rights are

being exercised or from who the rights are being exercised derive or a third party.

(d) The Carrier reserves all rights of recourse and subrogation against all third parties.

(e) In the event of death or bodily injury resulting from an aircraft accident, as defined by article 28 of the Convention and pursuant to article 5 of Regulation (EC) No 889/2002 of the European Parliament and of the Council of 13 May 2002 amending Council Regulation (EC) No 2027/97 of 19 October 1997, the relevant person(s) referred to herein shall benefit from an advance payment to enable him/her to meet his/her immediate needs, which advance payment shall be in proportion to the material damage suffered. Said advance shall not be less than the equivalent in euros of 16,000 SDR per Passenger in the event of death. Subject to applicable law, said advance shall be paid within 15 days of the identification of the Beneficiary.

Pursuant to article 5 of Regulation (EC) No 889/2002 of 13 May 2002 and article 28 of the Montreal Convention of 28 May 1999, the payment of such advance or any early payment shall not constitute any recognition of liability and said amounts may be offset against any amounts which subsequently become due by the Carrier.

Said advance payment shall not be refundable unless the person who received the advance payment was not the person entitled to compensation or when the damage was caused or contributed to by the negligence or other wrongful act or omission of the person claiming compensation, or the person from whom he or she derives his of her rights.

### 19.2.2 Damage as a result of Delays

(a) The liability of Carrier in respect of any Damage caused by delay in the carriage by air of Passengers shall be limited to 5,346 SDR's for each Passenger.

(b) The liability of Carrier in respect of any Damage caused by delay in the carriage by air of Baggage shall be limited to 1,288 SDR's for each Passenger. To this limit Article 19.2.3 (c) shall be applicable.

(c) Notwithstanding the provisions of subparagraphs (a) and (b) of this Article, Carrier shall not be liable for any Damage occasioned by delay if Carrier proves that it and its servants and agents took all measures that could reasonably be required to avoid the Damage, or that it was impossible for it or them to take such measures.

### 19.2.3 Damage to Baggage

(a) In accordance with article 17 of the Montreal Convention, the Carrier is liable for Damage caused by loss of, or damage to Checked Baggage, upon condition only that the event which caused the loss or damage took place on board the aircraft or during any period during which the Carrier had custody of the Checked Baggage.

(b) Exclusions of the Carrier's liability:

- The Carrier shall not be liable for Damage to Baggage where said Damage results from the nature of or an inherent defect, quality or vice of the Baggage. If Baggage or property contained therein cause damage to another person or the Carrier, the Passenger must compensate the Carrier for all losses suffered and costs incurred as a result.
- The carrier shall not assume any liability, other than that provided for in subparagraph (c) below for any Damage and/or loss caused to fragile, perishable or valuable items or items that are not adequately packed.

c) Amount of the Compensable Damage:

- The Carrier's liability in the event of destruction or loss of or damage to Baggage shall b limited to 1,288 SDR per Passenger. If a higher value was declared in accordance with Article 10.2.3(a) the Carrier's liability shall be limited to the value declared, unless the Carrier can provide proof that said value is higher than the Passenger's genuine interest at the time of delivery.
- For Unchecked Baggage allowed on board, the Carrier can only be held liable in the event of a proven fault by the Carrier, its servants or agents.

## ARTICLE 20: TIME LIMIT ON CLAIMS AND LIABILITY ACTION

### 20.1 Notification of Claims for Baggage

(a) The receipt of Checked Baggage without complaint is prima facie evidence that the Baggage was delivered and accepted in good condition and in accordance with the Contract of Carriage, unless the Passenger provides proof to the contrary. All missing Baggage must be declared to the Carrier as soon as the flight arrives. Any declarations made subsequently will not be taken into account.In the same way, any item noted as missing from Baggage must be declared to the Carrier as soon as possible. Any late declaration will not be taken into account.

(b) In the event of damage, the person entitled to delivery must complain to the Carrier forth with after the discovery of the damage, and, at the latest, within 7 days from the date of receipt in the case of Checked Baggage. In the event of delay, the complaint must be made at the latest within 21 days from the date on which the Baggage has been placed at his/her disposal. Every complaint must be made in writing and given or dispatched within the times aforesaid. If no complaint is made within the times aforesaid, no action shall lie against the Carrier, save in the case of fraud on its part.

### 20.2 Liability Actions by Passengers

All claims and rights to damages shall be extinguished if an action is not brought within a period of two years reckoned from the date of arrival at the destination or from the date on which the aircraft ought to have arrived, or from the date on which the Carriage stopped. The method of calculating that period shall be determined by the law of the Court seized of the case.

### 20.3 Claims and Actions to be Submitted in Writing

ALL THE CLAIMS OR ACTIONS MENTIONED IN ARTICLE 20 MUST BE MADE IN WRITING, WITHIN THE TIME LIMITS SPECIFIED.