# EXHIBIT 1

DEPT. OF PUBLIC HEALTH

# THE LIES IN YOUR GROCERY STORE

*Most people accept the gimmicks of food labelling. One lawyer can't stomach them.*

By Sarah Larson
September 4, 2023



Spencer Sheehan has sued the makers of Pop-Tarts, Trident chewing gum, and dozens of other companies, waging war against an industry.   Illustration by Jordan Speer

Save this story

Play/Pause

Volume

Listen to this article.

I n 2021, Duval Clemmons, a retiree from the West Bronx, went to his local BJ's Wholesale Club and discovered a pleasant surprise in the dairy aisle. Clemmons, sixty-eight, had a long career as a maintenance worker, but was disabled when he fell

down some subway stairs, in 2009. "I'm trying to eat healthy when I can, and when I can afford it," he told me recently. "So when I seen plant-based butter, I said, 'Oh, this is *real* cool. This is what I *need*.' " What he saw was Country Crock Plant Butter Made with Olive Oil, a product with a green lid and a label showing a leafy olive branch floating above a buttered slice of toast, with the words "New!" and "Dairy Free" in delighted-looking cursive. "Most margarines, they don't put pictures of the ingredients," Clemmons went on.

Clemmons, like many of us, had veered toward margarine in the late twentieth century, believing it to be a healthier alternative to butter. "Margarine was my go-to thing," he told me. "Margarine was amazing. But when I found out that it's also an artery clogger, in the early two-thousands, I switched over to olive oil." Clemmons knows many people with heart disease; some of his friends have died from it. He bought the Country Crock and began to eat it on his toast. A few months later, he saw an image of the product online, in an ad looking for members of a class-action lawsuit. Reading, he made a startling discovery: the spread wasn't made of olive oil, or even mostly made of olive oil. The primary ingredient was a processed blend of palm and canola oils. "I'd been drawn in because of the picture," Clemmons told me. "And they knew that. I'm *sure* they knew that. Why wouldn't people be attracted to things that are natural?"

In 2022, the attorney who had placed the ad, Spencer Sheehan, of Great Neck, Long Island, named Clemmons as the lead plaintiff in a lawsuit against Upfield U.S., Inc., the makers of Country Crock. The complaint alleges that this "so-called plant butter," as Sheehan described it to me, is margarine in disguise. "Since the dawn of recorded history, humans have enjoyed butter, made from fresh cream and salt, on a farm," Sheehan's complaint begins. "For the past 150 years, imitators of butter have attempted to sell yellow-colored blends of beef tallow and vegetable oil to consumers as butter, through the product known as margarine." Sheehan asserts, reasonably, that we seek out olive oil for its health benefits, which palm and canola oils lack. Also, Country Crock Made with Olive Oil had twice the calories of Country Crock Original, and was more expensive.

Sheehan, forty-four, specializes in consumer-protection class-action suits. Specifically, he focusses on packaged foods, and on the authenticity of their ingredients and flavors. Sheehan has sued the makers of frosted strawberry Pop-Tarts (dearth of real strawberries), Hint of Lime Tostitos (absence of lime), Snapple "all natural" fruit drinks (absence of natural juice), Keebler's fudge-mint cookies (lack of real fudge and mint), Cheesecake Factory brown bread (insufficient whole-grain flour), Trident original-flavor gum (lack of real mint, despite package's illustration of a blue mint leaf), and many more, generally seeking millions in damages from each. He also pursues class actions unrelated to food, involving subtle fraud in products such as toothpaste (Tom's of Maine Fluoride-Free Antiplaque & Whitening, for containing no ingredient that fights plaque) and sunscreen (Coppertone Pure & Simple, for being neither). Sheehan emphasized this breadth of scope during our first phone conversation. "It took Matthew McConaughey years after that movie he did with Sarah Jessica Parker—'Failure to Launch'? —to be taken seriously as an actor," he told me. "No one likes to be typecast."

But Sheehan has been typecast, with his tacit approval. He's a food-label zealot, and is especially relentless with vanilla cases. (Tabloids have called him "the vanilla vigilante.") "Real" fruit and artificial smoke flavoring are in his crosshairs, too. Since 2018, Sheehan's firm has filed more than five hundred consumer-protection class-action suits, making New York one of the top states for such cases. At annual food-law conferences, presenters displaying litigation trends provide two sets of statistics: one including Sheehan's cases, one without. Some of his lawsuits, including one involving an "aged vanilla" claim made by A&W Root Beer, have resulted in multimillion-dollar settlements; some make headlines; many are dismissed. Defendants and judges "might roll their eyes at a case," Sheehan said, "because, yes, it can be somewhat amusing. But I can proudly and honestly say I've never been sanctioned by a court for filing anything frivolous."

To the outside observer, some of the quiet comedy of Sheehan's work comes from the fact that we don't necessarily consider snack-food flavoring to be "real," and from the startling idea that anyone would. For Sheehan, though, the farce is the deception itself. " 'Smokehouse' almonds," he muttered. "These almonds have never *seen* a smokehouse in their— and Blue Diamond never *owned* a smokehouse, either." He has sued the company eleven times.

Sheehan's firm occupies a suite in a five-story office building in Great Neck, a well-off village about forty minutes from Manhattan. It's part of New York's Third Congressional District, the one that elected George Santos and wishes it hadn't. The village's quaint center has the vaguely Tudor design of Brookline or Forest Hills, and a giraffe-print bench emblazoned with the words "GREAT NECK." When I first visited Sheehan, he was alone, in a windowed office next to some cubicles. The space was undergoing noisy renovations—the firm had grown from two employees to eight in three years—and everyone else was working from home. Sheehan, who has a boyish face and affect, wore a pink gingham shirt and a thick tan cardigan. It was a seventy-five-degree spring day, and a space heater that said Comfort Zone was on.

"Specialization can be really nice, like a warm blanket," Sheehan told me. The day's work included a Zoom call with an attorney representing Upfield, the margarine conglomerate; a meeting with a judge, involving a berry-flavored-Fanta case; updating a plaintiff about a Kroger apple-juice-cocktail situation (" 'Cocktail' is one of those weasel words"); and writing a complaint in a "slack-fill" case, involving a too-empty box of Sour Jacks candy. Sheehan turned and smiled after typing "46% full" into a document. "I do some of my best work after everybody goes home," he said.

Cases come to Sheehan via many sources, including leads from the public and his own observations. He gave me an example. "So somebody contacted me about those little Fireball bottles," he said. He was talking about Fireball Cinnamon, a beverage that looks like a tiny bottle of Fireball Cinnamon Whisky—red cap, auburn-colored liquid, label bearing Fireball's signature fire-breathing dragon. But Fireball Cinnamon doesn't contain whiskey; it's a malt beverage with whiskey flavors, which it indicates in fine print. Sheehan was suing its parent company, Sazerac, for fraud. "We're used to seeing mini bottles of alcohol, and we expect it to be hard liquor," Sheehan told me.

"Like, you wouldn't buy a tiny beer," I said.

"That's right," he went on. "When most people see it, especially in places like a gas station or convenience store, where they sell these 'sin tax' products—tobacco, the lottery, it's up there with all the bad stuff—booze isn't so far-fetched. You're going to see something familiar and say, 'Hey, I'll buy it.' "

He looked into the Fireball situation, discovered that he had a potential case, and took out an ad seeking class members—people who'd assumed they'd been buying whiskey—on social media. "And it asked them to contact me, sort of like, 'Have you or your loved one spent time at Ground Zero after 9/11?' " he said. "I'm sure we've all heard those ads on the radio or on TV."

Sheehan pays a marketing company to handle the placement of his ads, primarily on Facebook, and to sometimes list them on Web sites such as Top Class Actions, where people can peruse cases. He follows up with those who respond, explains what's involved ("I tell people that it's almost like jury duty or voting—don't do this because you're expecting any money"), and files a lawsuit. Each case has a named plaintiff, someone who represents the class, and who typically gets an incentive award if there's a settlement. "Usually a few thousand dollars," Sheehan said. Sheehan is paid through fees that accompany settlements; none of his clients are charged.

Sheehan views himself as a tribune of the masses. "We are acting on behalf of the public," he told me. "That's what the consumer-protection laws of each state are designed for." Most regulations on food labelling and representation emanate from the federal government, namely the Food and Drug Administration. But states can supplement those laws—New York's proposed warning labels on sugary items, for example—and, more important, decide how to enforce them. In Sheehan's opinion, they barely enforce them at all. "One of the differences between our country and places like Europe, where they don't have as many lawsuits, is that they have much broader government enforcement and supervision," Sheehan told me.

He tidied up some file boxes, which were full of empty bottles and wrappers: Haribo, Annie's, Hall's, Perrier, Ice Breakers spearmint Ice Cubes, Kellogg's Harvest Wheat Toasteds, Twizzlers, and so on, all waiting to be scrutinized. "People send me these things," he said. It was time for his Zoom call with August Horvath, a partner at the law firm Foley, Hoag, which represents Upfield in the Country Crock Made with Olive Oil case. "He's an egghead, an intellectual," Sheehan said. He and Horvath have squared off many times, and their dynamic recalls the Looney Tunes wolf and sheepdog, who exchange pleasantries before punching in for a day of battle. A blank box with Horvath's name appeared onscreen. "Hello!" Sheehan said. "August, you're not on video?"

"I'm not having a great hair day," Horvath said. Sheehan warned me not to talk much: "These guys love to fight about everything."

It's a common experience in consumerhood, and in life itself, to imagine that how something is presented at least approximates its reality, and to be disappointed to discover that it does not—that we've been hoodwinked, even if subtly, for the benefit of the seller. (Think of Ralphie, in "A Christmas Story," when his long-coveted decoder pin from an Ovaltine-sponsored radio show finally arrives, only to reveal a secret message that tells him to drink his Ovaltine.) Americans, especially, understand the compact of commerce, and rarely begrudge our role in that near-patriotic process. But nobody wants to be a sucker.

Salesmanship becomes particularly complex in the vast middle of the supermarket, where "edible food-like substances," as the writer Michael Pollan has described them, are sold, between fresh produce on one end and chilled dairy on the other. Makers of processed foods, which are the main target of Sheehan's investigations, expend considerable effort trying to convince consumers that their products are healthy, "natural," and desirable, and we expend some effort believing them, often so that we can enjoy the products' deliciousness. "The field is all about connotation, whether verbal or visual," Jacob Gersen, the director of Harvard Law School's Food Law Lab, told me. "Traditionally, private market gets the front of the package, and government gets the back." Front labels give us images of farms and fields, and talk of antioxidants, fibre, omega-3s, vitamins, and probiotics; on back labels, we find "natural and artificial flavors," high-fructose corn syrup, carrageenan, soy lecithin, and xanthan and guar gums.

The gap between these realms is Sheehan's wheelhouse. On a humid day in August, Sheehan and I visited King Kullen, a supermarket in Manhasset, Long Island. Sheehan approached its terrain the way a finely tuned metal detector approaches a beach. "Potato rolls," he said, picking up a package and looking skeptical. "It might be impossible to make a roll that is predominately potato flour." He talked about the F.D.A. and its establishment, in the nineteen-forties and fifties, of thousands of pages of standards, and the particular challenges of artisanal bread. In the jelly-and-jam section, he palmed a jar of Polaner All Fruit. "I had a case against this product," he said. "It's not all fruit, because it has citric acid and natural flavor. I even let them slide on the pectin." He paused, then added, "There is no technical barrier to selling a product that actually is all fruit."

Much of Sheehan's work—and the work of the judges and lawyers he spars with—involves parsing the mind of the "reasonable consumer," a figure who, in her mystery and authority, can seem nearly mythical. As Sheehan sees it, the reasonable consumer isn't necessarily a highly educated professional, or "LinkedIn type"; she's a regular person with a regular job. She trusts that a product's name and packaging imagery closely resemble its contents. In the view of most courts, she isn't

overly credulous—she expects fruit in her jam, but not in her Froot Loops—and, to Sheehan's repeated frustration, she probably knows that "vanilla" denotes a flavor, not an ingredient.

We passed a rack stocked with Sheehan's old foe, Blue Diamond Smokehouse Almonds. In one pending case, a court agreed that the bag's color scheme evoked fire, suggesting, wrongly, that the flavor was drawn from a natural smoking process. Nearby, at the butter-and-margarine cooler, Sheehan noted another layer of deception. "If it's more than eighty per cent fat, they have to call it margarine," he said. "So they make it seventy-nine per cent. Nobody wants to be called margarine." He picked up a container of Country Crock with Olive Oil; his suit is ongoing, but the company had already removed the word "Made." (Beside it: Country Crock with Avocado.)

A packet of tortillas reminded Sheehan of a suit in which the company's "use of a Mexican flag" overdid its supposed Mexicanness; a row of flavored Poland Spring sparkling waters made him light up. "I'm responsible for the change of this label, but nobody will ever admit that," he said, picking up a bottle of its lemon variety. "It used to say 'a twist of lemon.' This —'lemon flavor'—is a little better, but not technically compliant." Sheehan's case was dismissed, and the labels looked a little haphazard, as if someone had added the word "flavor" under duress. (Poland Spring attributes the change to "a brand refresh.") In the dairy section, he pointed out a dubiously Icelandic yogurt he'd sued ("It was made in Brooklyn or something. I thought our case was very good"), mentioned cases he'd filed against various creamers, and shook his head at a box of milk-chocolate-covered Dove ice-cream bars. "These should say 'milk chocolate *and fat or vegetable-oil* coating,' " he said.

"That sounds disgusting," I said.

"It might sound patrician, but it enables people to make decisions of quality," he said.

As we strolled the aisles, Sheehan, who hadn't planned to buy anything, picked up a basket and began to fill it. He rooted around a floor-level canned-tomato shelf, telling me about San Marzano certification standards, and noted a brand that was noncompliant: "That's good, because now I can sue them again." He feistily observed that Kind granola's large-font "10 grams of protein" claim assumes that you'll be eating a cereal bowl full of it. At self-checkout, Sheehan rang up several products to examine for potential lawsuits, as well as a packet of dried apricots. "The problem with dried apricots is, you eat the whole bag," he said. Then we went for pizza, his usual dinner; Sheehan doesn't cook.

Sheehan, the son of a speech therapist and a carpenter, grew up on Long Island, and on our drive he pointed out his boyhood home, a tidy gingerbread-style house on a pleasantly appointed street. Sheehan is unmarried and close to his family. (His mother lives across town.) A vegetarian, he volunteers with local animal-rescue groups, and he travels with a Havahart trap in his car, for capturing strays. He set up heated sheds for feral cats in his mother's back yard, opposes society's "anti-cat bias," listens to the pro-cat radio personality and Republican eccentric Curtis Sliwa, and does pro-bono work for people with "nontraditional animal companions," including the eighties subway shooter Bernhard Goetz, in an eviction case involving an alleged pet squirrel. (The case was settled out of court.) When I was in his office, he occasionally interrupted himself to reach out to his parents—calling his mom "just to say hi" mid-discussion of wheat labelling, sending his dad a video of a baby raccoon. "I love raccoons," he said, as the raccoon made squeaky noises.

Sheehan did well in school, but he didn't have any particular passions. He studied history at Georgetown and spent time in the U.S. Marine Corps Reserve. He eventually went to law school, at Fordham, but he didn't have any particular ambitions there, either. After winning a class-action suit against a streaming service—its subscriptions were un-cancellable—he took on some food-related cases, and enjoyed them. He opened his practice in 2013. "I take what I do very seriously," he told me. "I enjoy the intellectual aspects of it."

Some would argue that he takes it too seriously—that he's a hammer searching for nails. I asked an attorney who has represented several food companies about Sheehan's work, and cases like it. "I've seen some honestly good cases that Spencer

has filed," he said. At the same time, he went on, "I think one of the necessary characteristics of a lawyer is a client—you know, lawyers should be representing the interests of a party that is genuinely aggrieved." Sheehan's clients are occasionally unsolicited, but many of them are enlisted through ads. "And lawyers running around doing their thing without clients is bad for society," the attorney said. "I don't want to romanticize it too much, but in Japan, when the warlords collapsed, there were these samurai just running around—they were just warriors with no masters, right? And they were causing all kinds of trouble in nineteenth-century Japan."

Sheehan's warrior zeal is not entirely unrestrained. At his office, a prospective client called, railing against the forces that sold him a deconstructed Ping-Pong table. The man, a retired music producer ("Harry Chapin, Bette Midler"), had ordered the table online, from Walmart, but it was made by an overseas manufacturer. Reviews said that it was easy to set up; it wasn't. "It says 'four-piece,' but there are over three hundred pieces," the man said. "There *is* no manufacturing. The company is an absolute lie." He'd spent several days trying to put the table together, called Walmart ("All they offer to do is send you another bag of parts!"), and thrown the whole thing out in disgust. "This is gross," he said.

Sheehan wasn't optimistic. Walmart wouldn't be liable, and suing a foreign company would likely be fruitless. "I hate to tell people this, especially when they have a legitimate complaint, but not everything that is wrong can or should be fixed through a lawsuit," he said.

"These guys are laughing at us!" the man said. "They gather some material, they throw it in a box . . ." he trailed off. "Imagine if you bought a car and they put a thousand pieces in your driveway." Sheehan suggested that the man "politely" write a review on Walmart's site, with pictures, then asked him to keep Sheehan in mind for potential mislabelling cases, whether "a TV or a certain cosmetic product." He gave similar advice to a woman who wanted to sue the Post Office over a P.O.-box imbroglio.

In the cases that Sheehan pursues, plaintiffs and class members provide depositions, often over Zoom, in which they are sworn in, pledge to tell the truth, and proceed to answer questions from an attorney representing a multinational corporation about their experience with a can of butter spray, a wedge of cheese, or a loaf cake. These can be strangely poignant. The class members don't evoke the snack-food equivalent of a neck-brace-wearing personal-injury firebrand; they're regular people describing consuming a grocery item, with softly disappointing results. In the case of Williams et al. v. Molson Coors, the defending attorney had one of Sheehan's clients, a gym-membership manager, recount her experience buying a twelve-pack of Vizzy Hard Seltzer, which stressed the presence of "antioxidant vitamin C."

"And when you saw the statement about antioxidant Vitamin C, what did you take away from it?" the attorney, Chris Cole, said.

"Being in the health-and-fitness field, knowing antioxidants play a good role in your daily life style and whatnot, I figured they would be beneficial in, you know, negating some of the negative things about alcohol," the client said. They weren't; she didn't like the flavor, either.

Cole asked how she'd expected to notice the effects of the antioxidants. "You mean that there's no immediate obvious feeling you get after consuming Vitamin C?" he asked. No, she said. That cosmic detail notwithstanding, the case proved successful—the seltzer was made with citric acid, which is low in Vitamin C—and it resulted in a $9.5-million settlement. Vizzy no longer makes claims about antioxidants.

Most Sheehan cases assert that a buyer would have forgone purchasing a product, or expected to pay less, if it had been marketed accurately. In May, I watched him prepare a named plaintiff, Stacey Castle, for a deposition about Kroger's Private Selection brand of smoked Gouda. Castle, on a Zoom call from Wisconsin, had her hair in a loose bun, and her iPad camera was angled up from below her chin. When she bought the cheese, she'd understood it to be a justifiable splurge, because the Gouda was actually smoked. When she realized it was not, she was sitting in her dining room. "I'm reading the back label, 'cause I had the cheese sitting on the table," she said. "My exact thought was, You have to be shitting me." She looked fired up.

"Were you injured?" Sheehan asked, playing opposing counsel.

"My pocketbook was!" she said.

The 1933 World's Fair, in Chicago, featured an exhibit known as the American Chamber of Horrors—a kind of food-and-drug freak show of products that were up to no good. Strawberry Bred-Spred was a jar of what appeared to be strawberry jam but was actually pectin, red food coloring, and hayseeds. Noodles packaged in yellow cellophane, to resemble egg noodles, were displayed alongside noodles in honest, untinted wrapping. A bottle of vanilla extract, an expensive commodity, had deviously thickened glass, creating an illusion of abundance. The Great Depression had strained food sources to the limit, and producers, like many Americans, were desperate to stay afloat. But the F.D.A., which had emerged after the passage of the 1906 Pure Food and Drugs Act, didn't yet have the authority to recall products such as Bred-Spred—or even some lethal drugs. So it created the Chamber of Horrors, which travelled the country to raise awareness.

It takes a seismic jolt in mass consciousness to regulate American commerce. One jolt arrived in 1905, when Upton Sinclair's "The Jungle" revealed the terrors of the meatpacking industry, and suggested that a reader's sausage might be flecked with rat feces or sawdust. (The book had helped marshal support for the Pure Food and Drugs Act.) Another came in 1937, when more than a hundred people died after taking Elixir Sulfanilamide, an antibiotic that hadn't been tested for safety. The response was the 1938 Federal Food, Drug, and Cosmetic Act, a sweeping and robust set of laws, and the basis of U.S. food regulations ever since.

The government has often been gung ho in its health-education efforts: the U.S.D.A.'s nutritional guides and food pyramids, seventies Saturday-morning-cartoon P.S.A.s, Michelle Obama's Let's Move! campaign. But the arc of progress has been long. Nutrition labels weren't required until 1990, per-cent-juice labelling wasn't widely introduced until 1994, and trans-fat labelling began in 2006. "Other countries have figured it out," Michael Pollan told me: front-of-package junk-food warnings in South America, Asia, and Europe; a red-yellow-green stoplight system in the U.K. It can take something like the F.D.A.'s fast-food-disclosure regulation of 2016, in which McDonald's customers were forced to contend with the calorie count of their Big Macs, to remind us that the nature of what we're eating could be conveyed in a startlingly clearer way.

In the absence of such clarity, some of Sheehan's cases can make him seem like the boy observing that the emperor is naked. Consider his whole-wheat-flour cases, which point directly to nutrition. "Whole wheat," Sheehan explained, means "whole grain," which includes the three parts of the wheat grain: the fibre-dense bran, the nutrient-rich germ, and the starchy endosperm. It's widely acknowledged to be better for you than white flour, which contains only the endosperm, but all wheat-flour products, including white, can legally be called "wheat," and are often dressed up to seem healthier than they are. Sheehan walked me through the tricks: adding caramel color; adding oats to the outside of bread; giving bread a heartier, richer, or mottled appearance. Companies "use vague terms like 'multigrain' or 'honey oat' or 'honey wheat,' with an image of a stalk of wheat," Sheehan said. He looked philosophical. "Some might say, you know, 'Big Food has a conspiracy to make us all fat and lazy.' I don't know if that's the case, but I think they might say people don't like the taste of whole wheat as much."

I asked Gersen, of Harvard, about how to regulate ambiguous labelling. "It's actually a much harder problem than I originally thought," he said. "Like, there's a really strong incentive to over-claim and deceive. Even if you say a reasonable consumer wouldn't be tricked, it's almost certainly the case that *somebody* would. That's why the company is doing it. And across a lot of food products, across a lot of brands, across a lot of the population, that's actually not a trivial number of people." In Sheehan's Country Crock complaint, he observes that consumer-research organizations—namely Mintel, one of the largest in the world—advise companies on how to respond to shifting demands, including by lending margarines and spreads a healthier, more "natural" profile. When I talked to some Mintel employees, they seemed to agree with Sheehan's characterization, without taking credit for it. "The one thing I find funny is this revolutionary new product that's been talked about the last couple of years: plant butter!" Lynn Dornblaser, a product-trend analyst since 1986, said. She laughed. "I think that's margarine. But that has revitalized some brands—becoming 'plant butter,' or talking about being 'plant-based,' because plant-based is the hot, cool thing."

Defendants usually try to have Sheehan's cases dismissed, "which I always find to be somewhat offensive," Sheehan said. "It often feels like they're trying to gaslight you." He read Horvath's response to the Country Crock complaint. "What chutzpah! He says, 'Has no basis to allege'? I mean, no basis? That's a little crazy." Sheehan was bullish on the case's prospects, citing a precedent involving "whole-grain" Cheez-Its; and, indeed, the Country Crock judge had scoffed at the defendant's claim that "Made with Olive Oil" was merely meant to convey "a flavor note." "It's fallen to lawyers like this to offer any kind of accountability," Pollan told me. "I don't think it's the ideal way to do it. But it's the way the government has left us to do it."

Around the time that Sheehan was marvelling at Country Crock's response, Democrats in Congress introduced the Food Labeling Modernization Act, a bill that would dramatically change regulations for food labels. "We've all struggled at times to navigate today's opaque food labels and 'healthy' marketing claims during trips to the grocery store," Representative Frank Pallone, Jr., of New Jersey, said. The legislation, he continued, would make it easier for consumers to determine "the right food choices for their families." The bill's co-sponsor, Senator Richard Blumenthal, of Connecticut, said that the legislation would reform "antiquated" rules and include "front of package labels, clearly marked allergens, and clarified guidelines to deter misleading claims." If enacted, the bill could be a boon for consumers and disrupt the processed-food industry. For that reason and others, it has little chance of becoming law.

A couple of weeks after Sheehan proudly and honestly told me that he'd never been sanctioned by a court for filing something frivolous, a court threatened him with sanctions for filing something frivolous. Judge Steven Seeger of the Northern District of Illinois, after dismissing a complaint of Sheehan's about the lack of lemon in Polar lemon seltzer ("The complaint fizzles, and has no juice," Seeger wrote, in an opinion densely fortified with food zingers), issued an order requiring Sheehan to provide the court with a list of all his firm's class-action filings since 2020, accompanied by explanations of their results.

In recent months, judges and defendants have begun to challenge Sheehan's suits more broadly. Illinois is home to Mondelēz International, one of the world's biggest producers of snack foods, which encompasses brands from Oreo and Chips Ahoy! to Ritz, Triscuits, Cadbury, Sour Patch Kids, and Tang—and, until 2022, Trident, Dentyne, Bubblicious, and other gum brands. Sheehan had sued several of them, including Trident, a case that Judge Iain D. Johnston, also of the Illinois Northern District, had dismissed in February. ("When gum gets stuck somewhere it does not belong, conventional wisdom provides a host of remedies: ice cubes, peanut butter, vinegar, or olive oil," Johnston wrote. "When a federal case gets stuck somewhere it does not belong, the Federal Rules of Civil Procedure provide a different, cleaner remedy.") That month, Mondelēz, in response to the dismissal of the Trident-gum case, requested sanctions against Sheehan, including payment of its attorneys' fees. Its request described him as a prolific filer of "copy-and-paste" complaints; in May, Judge Johnston chose to remind Sheehan that "spaghetti is best eaten, not thrown at walls," and requested a copy of the document that Judge Seeger had demanded.

That document, which Sheehan attached as a thirteen-page spreadsheet in his response, "provides extraordinary insight into the track record of most prolific consumer class action attorney in the United States," the lawyer Chris Cole wrote on his firm's blog. Cole has defended clients against Sheehan's suits, including in the Vizzy Hard Seltzer case. "By my rough count, between January 1, 2020 and April 7, 2023, Mr. Sheehan filed 553 complaints," he wrote. "Of those, 120 (21.6%) were dismissed outright and 35 (6.3%) survived a motion to dismiss at least in part. The remaining 398 (roughly 72%) were either settled or are still pending." Cole estimated, conservatively, that since 2020 defense costs for Sheehan's cases could have amounted to forty-two million dollars.

Several reports stressing the frivolity of Sheehan's suits, and cases like them, have been generated by firms that represent food-and-beverage companies. The New York Civil Justice Institute, which describes itself as nonprofit and nonpartisan, published a paper in 2021 called "Class Action Chaos," by Cary Silverman, a partner at the firm Shook, Hardy & Bacon, which represents food-and-beverage companies. "Class Action Chaos," which says that the suits are "making a mockery of the state's civil-justice system," has been cited in national-news stories about Sheehan; other lawyers I talked to in the food-law realm, including on the defendants' side, disputed that characterization. They saw Sheehan's suits as a product of the failures of the tort system, or as a necessary corrective in an era of gray-area regulation. Several skeptics admitted to me that some of his suits have "some there there." "Spencer won't reject a case just because it has merit," one said, chuckling.

Though judicial scolding for Sheehan has increased, sanctions, so far, have not. And this summer, Judge Seeger, of the copious zingers and admonishments, directed his ire not toward Sheehan but toward his opponent, B&G Foods, in a case concerning Crisco's No-Stick Butter Cooking Spray. In August, as we finished eating at the pizza parlor, I asked Sheehan whether judges' warnings would affect his behavior in the future. "No!" he said. "Why should it? The only thing it affects is that I have to take time to respond to those demands, rather than doing work." He pointed at my plate. "Do you want another slice?" ♦

*Published in the print edition of the [September 11, 2023](#), issue, with the headline "You've Been Served."*

## NEW YORKER FAVORITES

- In the weeks before John Wayne Gacy's scheduled execution, he was far from reconciled to his fate.

- What HBO's "Chernobyl" got right, and what it got terribly wrong.

- Why does the Bible end that way?

- A new era of strength competitions is testing the limits of the human body.

- How an unemployed blogger confirmed that Syria had used chemical weapons.

- An essay by Toni Morrison: "The Work You Do, the Person You Are."

Sign up for our daily newsletter to receive the best stories from *The New Yorker*.



*Sarah Larson, a staff writer, has been contributing to The New Yorker since 2007.*

Your guide to the latest magazine and our biggest stories of the week, plus highlights from podcasts, humor, and more.

E-mail address

E-mail address

Sign up

By signing up, you agree to our User Agreement and Privacy Policy & Cookie Statement. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

## READ MORE

PROFILES

### Kwame Onwuachi's Cuisine of the Self

How the chef at Tatiana brought Afro-Caribbean cooking—and his life story—to the center of New York City's fine-dining scene.

**By Hannah Goldfield**

A REPORTER AT LARGE

### The Crimes Behind the Seafood You Eat

China has invested heavily in an armada of far-flung fishing vessels, in part to extend its global influence. This maritime expansion has come at grave human cost.

**By Ian Urbina**

FLOWER POWER

### A New York Daffodil? Fuhgeddaboudit

Azalea vs. spicebush vs. sunflower: Horticulture nuts in all five boroughs vie to make their flower the city's official bloom.

**By Adam Iscoe**

POEMS

### "Springfield"

**By Andrea Cohen**

Cookies Settings